476 F.2d 142
 5 ERC 1010, 99 P.U.R.3d 66, 3 Envtl.
L. Rep. 20,213
 ATLANTA GAS LIGHT COMPANY et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
ATLANTA GAS LIGHT COMPANY et al., Plaintiffs-Appellants,
v.
SOUTHERN NATURAL GAS COMPANY and Federal Power Commission,
Defendants-Appellees.
ALABAMA GAS CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 72-1475, 72-1539 and 72-1415.
 United States Court of Appeals,
Fifth Circuit,
 Feb. 7, 1973.
Rehearing Denied July 11, 1973.
 
 Albert G. Norman, Jr., Carroll L. Wagner, Jr., Atlanta, Ga., and John E. Holtzinger, Jr., Washington, D. C., for Atlanta Gas Light Co.
 James E. Joiner, Atlanta, Ga., for Ga. Power Co.
 John W. Hinchey, Asst. Atty. Gen., and Arthur K. Bolton, Atty. Gen., Atlanta, Ga., for Ga. Public Service Comm.
 John Izard, Jr., and Charles L. Gowen, Atlanta, Ga., James J. Flood, Jr., Washington, D. C., and Ronald L. Kuehn, Jr., Birmingham, Ala., for Southern Natural Gas Co.
 John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., Gordon Gooch, Gen. Counsel, George W. McHenry, Jr., Comm. Staff Counsel, Leo E. Forquer, Sol., J. Richard Tiano, First Asst. Sol., F.P.C., Washington, D. C., for F.P.C.
 Edwin D. Robb, Jr., and George W. Williams, Savannah, Ga., for Savannah Electric & Power Co.
 Howard E. Wahrenbrock, Washington, D. C., for Miss. Valley Gas Co.
 Thomas F. Brosnan, Washington, D. C., Leon M. Payne, Houston, Tex., R. Y. Patterson, Jr. and Norman E. Duke, Winter Park, Fla., for Fla. Gas Transmission Co.
 Before JOHN R. BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.
 BELL, Circuit Judge:
 
 
 1
 Under Sec. 4 of the Natural Gas Act, 15 U.S.C.A. Sec. 717c, any "natural-gas company" must file with the Federal Power Commission a notice of any change in a service rendered by the company in connection with the sale or transportation of natural gas subject to the jurisdiction of the Commission. Subsections (d) and (e) of Sec. 4 provide that the Commission may, upon receipt of a notice of change, allow the change to take effect, or it may "suspend" the change until it determines, after hearing, that the change is lawful.[1] These consolidated appeals arise (1) from petitions for review filed by Alabama Gas Corporation (Alagasco), Atlanta Gas Light Company (Atlanta Gas), et al., who challenge the lawfulness of the Commission's action in allowing Southern Natural Gas Company (Southern), a jurisdictional pipeline, to institute a plan which curtails gas deliveries under contracts between Southern and the petitioners, and (2) from the dismissal by the district court of a complaint filed by Atlanta Gas and others seeking declaratory relief against the Federal Power Commission for its interim adoption of Southern's curtailment plan, and equitable relief and damages against Southern for breach of its service contracts. We affirm the action of the Commission challenged in the petitions for review, and we affirm the dismissal of that portion of the district court complaint which relates to the prayer for declaratory and equitable relief. For reasons stated, we vacate the dismissal of that portion of the complaint which relates to the prayer for damages and remand to the district court to retain jurisdiction for possible further proceedings.
 
 Nos. 72-1415 and 72-1475
 
 2
 On April 15, 1971, the Federal Power Commission issued Order No. 431. That order required all jurisdictional pipelines to submit "written reports" to the Commission stating how the pipelines would implement the Commission's policy of protecting the dwindling supply of natural gas and of insuring reliable and adequate service for the 1971-1972 heating season.[2] The order provided that any pipeline which, because of shortages, found that it would be "necessary" to curtail service during the heating season should file with the Commission revised tariff sheets embodying a curtailment plan, "pursuant to Secs. 4 and 5 of the Natural Gas Act." See footnote (2).
 
 
 3
 ******
 
 
 4
 * * *
 
 
 5
 In response to Order No. 431, Southern filed a revised tariff sheet with the Commission on November 24, 1971. The revised tariff curtailed the volume of gas which Southern was obliged to deliver under contracts with certain customers and established service priorities among several classes of customers.[3] Relying upon a statement by Southern that some curtailment of firm service commitments would be necessary during the 1971-1972 season, but expressly declining to decide whether elements of the plan were otherwise lawful, the Commission permitted the plan to take effect after a nominal suspension period of one day, pending completion of suspension proceedings under Sec. 4. These proceedings are still pending.
 
 
 6
 Alagasco, Atlanta Gas, and others,[4] whose service contracts with Southern were affected by the curtailment plan, petitioned the Commission for leave to intervene in the suspension proceedings. When the Commission permitted the curtailment plan to take effect, the intervenors requested the Commission to reconsider its interim action. These petitions were denied. A petition for partial stay of the suspension order, filed by Atlanta Gas, was denied by the Commission on March 24, 1972.
 
 
 7
 The petitions for judicial review of the Commission's action, filed pursuant to Sec. 19 of the Act, 15 U.S.C.A. Sec. 717r, followed in due course.
 
 
 8
 The petitioners contend that the Commission cannot, under Sec. 4, permit a curtailment plan to take effect on an interim basis without making, at the very least, a preliminary determination that the curtailment is necessary in order to effectuate the policies of Order No. 431. The petitioners contend, further, that where, as they alleged, the curtailment plan establishes service priorities that are inconsistent with priorities established in outstanding certificates of public service and convenience, the Commission cannot allow the plan to take effect without invoking the elaborate hearing procedure set out in Sec. 7 of the Act, 15 U.S.C.A. Sec. 717f. Finally, the petitioners contend that the Commission's action was unlawful because the Commission did not, prior to the interim action, undertake a detailed evaluation of the environmental impact of the curtailment order, as required by the National Environmental Protection Act (NEPA), 42 U.S.C.A. Sec. 4321 et seq.
 
 
 9
 The Commission maintains, first, that the contested action was not a reviewable order; second, that it may properly employ Sec. 4 procedures, unadorned by preliminary findings of fact, in the exercise of its curtailment power; and finally, that the NEPA does not require the issuance of a detailed environmental statement prior to the issuance of an interim suspension order.
 
 Reviewability
 
 10
 The Natural Gas Act provides for review by the court of appeals of "an order issued by the Commission in such proceeding" under the Act. 15 U.S.C.A. Sec. 717r(b). The Act does not require that the order be "final", and the Act does not, by its terms, impose any other limitation on the class of actions subject to review. The courts have recognized this fact; nevertheless, they have traditionally declined to review many actions which, in a literal sense, are "orders issued by the Commission in a proceeding" under the Act. In general, the courts have declined to review non-final orders that are not "definitive" in their impact upon the rights of the parties and do not threaten the petitioner with "irreparable harm". See Federal Power Commission v. Metropolitan, Edison Co., 1938, 304 U.S. 375, 58 S.Ct. 963, 82 L. Ed. 1408; Amerada Petroleum Corp. v. Federal Power Commission, 10 Cir., 1960, 285 F.2d 737; Algonguin Gas Transmission Co. v. Federal Power Commission, 1 Cir., 1953, 201 F.2d 334.
 
 
 11
 The requirement that the reviewable order be "definitive" in its impact upon the rights of the parties is something more than a requirement that the order be unambiguous in legal effect. It is a requirement that the order have some substantial effect on the parties which cannot be altered by subsequent administrative action. See Atlantic Seaboard Corp. v. Federal Power Commission, 4 Cir., 1953, 201 F.2d 568. The additional condition of reviewability -the requirement that the order threaten "irreparable harm"-is, to that extent, redundant, since an "irreparable" injury, like the effect of a "definitive" order, cannot be redeemed by subsequent official action. See Atlantic Seaboard Corp. v. Federal Power Commission, supra at 572.
 
 
 12
 We hold that the Commission's interim suspension order is reviewable because it is definitive in its impact upon the rights of the parties and threatens irreparable harm. The order permits Southern to withhold volumes of gas which it is obliged to deliver under private contract. The order may prove to be temporary, since it may be changed when the Commission considers the facts of the case on the merits. But the present effect of the order cannot be substantially altered by subsequent action of the Commission. There is nothing the Commission can do at a later date to change the fact that the petitioners do not now receive volumes of gas which they may be entitled to receive under contract. In terms of its impact upon the parties, the order is as "definitive" as it could be; and if it is legally injurious, its consequences will be irremediable at a later date.
 
 
 13
 The petitions for review are properly before this court.
 
 The Legality of Sec. 4 Procedures
 
 14
 In Federal Power Commission v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), the Supreme Court upheld the power of the Commission to order the curtailment of gas deliveries to all customers of jurisdictional pipelines-customers purchasing gas for their own consumption as well as customers purchasing gas for resale to ultimate consumers. More critically, for purposes of the present appeals, the court held that the Commission may properly utilize the procedures of Sec. 4 as a means of exercising its curtailment power.
 
 
 15
 Without seriously contesting the power of the Commission to order curtailments, the petitioners strenuously urge the impropriety of a curtailment procedure which allows a curtailment plan designed by a pipeline to take effect before the Commission has determined, after hearing or after some minimal preliminary investigation, that curtailment is "necessary" within the meaning of Order No. 431. Petitioners maintain that such a procedure is subject to abuse and, in fact, that it has been abused in this case: Southern, they contend, faces no shortages that necessitate a curtailment of firm or non-interruptible service, as contemplated by Order No. 431. Southern has chosen, they allege, to exploit the procedure sanctioned by that order to reallocate sales for its own financial gain. Petitioners maintain as well that in light of the inconsistency between priorities established in the curtailment plan and priorities established in outstanding certificates of public convenience and necessity, the plan should not go into effect without a hearing as contemplated by Sec. 7 of the Act. 15 U.S. C.A. Sec. 717f.
 
 
 16
 By arguing that a hearing is required, petitioners advocate a curtailment procedure which has been expressly rejected by the Supreme Court. In Louisiana Power & Light Co. v. Federal Power Commission, the court found that any process which would require the Commission to hold a hearing before taking remedial action would be an "unsuitable" vehicle for the exercise of curtailment power, because (1) the process would entail substantial delay and (2) any remedial order could only have prospective application. 406 U.S. at 643, 92 S.Ct. at 1840, 32 L.Ed.2d at 387. In essence, the court found that the general state of emergency created by the national shortage of natural gas necessitates a curtailment process which allows the Commission, in particular cases, to act "now" and find facts later. Accordingly, the court held that the adoption of such a procedure by the Commission was within the general power of the Commission to take all measures "necessary and appropriate" to effectuate the provisions of the Act. See 15 U.S.C.A. Sec. 717o. This holding is seriously at variance with the petitioner's position that a prior hearing is required where persons who oppose curtailment contend that it is not necessary within the meaning of Order No. 431, or that priorities established by the curtailment plan are inconsistent with priorities established in outstanding certificates of public convenience and necessity.
 
 
 17
 We hold that the consideration of these contentions may be properly deferred until the hearing is ultimately held, and that the Commission may not be required to abandon a procedure which facilitates effective interim action.
 
 
 18
 Similar difficulties attend the less sweeping argument that the Commission may permit a curtailment plan to take effect only after some minimal preliminary determination that the plan is consistent with Order No. 431. The Supreme Court has held that the Commission may employ the procedures of Sec. 4 in the exercise of its curtailment power. Section 4 does require the Commission to give reasons in writing when it suspends the operation of a proposed change in service. Absent suspension, however, there is no requirement that the Commission make a preliminary determination of the validity of the proposed change. In short, unless the Commission acts to suspend the proposed change, the change will take effect. The Commission may enter upon a hearing to determine the lawfulness of the change but the change will become effective unless suspended. We are not persuaded that a different procedure, one required neither by statute nor by case law, is required here, solely because the notice of change is filed in response to an administrative order (Order No. 431).
 
 
 19
 The argument of petitioners that a curtailment plan may not take effect without a preliminary determination by the Commission that a curtailment of firm or non-interruptible service is necessary is further weakened by the facts of this particular case. Here the Commission has made a determination of sorts. Petitioners sought to have the curtailment plan suspended for the full statutory period. Relying upon Southern's statement that a curtailment of firm service would be required during the 1971-1972 heating season, the Commission, informed by what the petitioners concede to be the "enormous amount of data" in its possession regarding the supplies of natural gas available to pipeline companies, determined that only a one-day suspension period was warranted in this case. This determination was made without benefit of a hearing and there was no decision as to whether elements of the curtailment plan were "unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful". This determination, presumably based on facts already within the knowledge of the Commission, was effective, pending a plenary hearing.[5]
 
 
 20
 *****
 
 
 21
 * * *
 
 The National Environmental Protection Act
 
 22
 Considerations that justify the Commission's power to follow expeditious procedures in the exercise of its curtailment power obtain with equal force where, as here, aggrieved persons contest the validity of an interim curtailment order on the ground that the Commission must undertake a detailed evaluation of the environmental impact of curtailment prior to the issuance of the order. A detailed evaluation of the environmental impact of a curtailment order would entail precisely the sort of delay which the Supreme Court noted and disapproved in the course of a decision which held that the Natural Gas Act authorizes the Commission to follow summary procedures in exercising its curtailment power. Louisiana Power & Light Co. v. Federal Power Commission, supra. Cf. Port of New York v. United States, 2 Cir., 1971, 451 F.2d 783. Such considerations of policy, together with the familiar principle of statutory construction which requires the reconciliation of diverse statutory provisions where reconciliation is possible, would in themselves be ample support for a holding that the NEPA does not mandate a detailed environmental investigation at the interim stage.
 
 
 23
 The mandate of the NEPA on federal agencies is that they comply with the procedural duties imposed by the Act to the fullest extent possible. See Calvert Cliff's Coord. Com. v. United States Atomic Energy Com'n, D.C. Cir., 1971, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114-1115. As there noted, the legislative history of the NEPA interprets "to the fullest extent possible" to mean compliance unless compliance would give rise to a violation of statutory obligations. As Louisiana Power & Light Co., supra, makes clear, the Federal Power Commission has a statutory duty to the public under the Natural Gas Act to take effective interim curtailment action in the exigencies presented by gas shortages. We cannot say that the NEPA suspends this duty of the Commission.[6]
 
 
 24
 In sum, we affirm the order of the Commission which is here in question.
 
 No. 72-1539
 
 25
 Claiming to be aggrieved by the interim curtailment plan which we have reviewed in Nos. 72-1415 and 72-1475, Atlanta Gas, et al., initiated a civil action in the district court. They asserted that the order was illegal and advanced arguments substantially the same as those later advanced in the petitions for review. By way of relief they prayed (1) for a declaration that the interim order had no effect upon Southern's contractual obligations, (2) for an injunction against Southern to restrain implementation of the curtailment plan, (3) for specific performance of the contract between Southern and Atlanta Gas; and (4) as to Atlanta Gas only, for damages for breach of contract. Finding that the Federal Power Commission and, on review, the court of appeals were the proper forums for the adjudication of these claims, the district court dismissed the complaint, relying upon the doctrine of primary jurisdiction and the special statutory review provisions of Sec. 19 of the Act. 15 U.S.C.A. Sec. 717r. We agree with the district court except as to the claim of Atlanta Gas for damages allegedly arising out of breach of contract.[7]
 
 
 26
 We have already decided, in our consideration of the petitions for review, that the interim curtailment order was valid. This is sufficient answer to any contention that the district court should have reviewed the action of the Federal Power Commission under the doctrine of reviewing administrative conduct alleged to be in excess of delegated powers or contrary to specific statutory provisions. Cf. Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).
 
 
 27
 At the same time, quite apart from questions concerning the legality of the interim order, the dismissal of the complaint by the district court raises question concerning the impact of a Federal Power Commission interim order, otherwise legal, upon claims grounded in private contract-claims which are alleged to be within the diversity jurisdiction of the district court. We turn then to these questions.
 
 
 28
 As to the prayers for specific performance and injunctive relief, the dismissal of the complaint was proper. An order as sought from the district court would have required Southern to deliver gas according to a schedule that was inconsistent with the curtailment plan placed into effect by the Commission. It would have constituted an unwarranted interference with lawful regulatory authority. Cf. Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784. The district court could not enjoin the Commission under the circumstances and it could not have achieved the same result by enjoing Southern and requiring it to perform the contract. Thus, as regards the prayer for injunctive and specific performance relief, the complaint, though within the diversity jurisdiction of the district court, did not state a claim upon which relief could be granted.
 
 
 29
 This leaves for consideration the question of damages for breach of contract presented in the context of diversity jurisdiction. Without the involvement of the Commission we would have nothing more than a simple suit for breach of contract under notice pleading concepts. No answer to the complaint has been filed. We have not seen the contract.
 
 
 30
 On the one hand, it is urged that the complaint does not state a claim upon which relief can be granted because of the primary jurisdiction of the Commission and because of the failure to exhaust administrative remedies. If on the other hand, a claim is stated for breach of contract, we are told of the anticipated defense of impossibility of performance due to the supervening Commission order. And, of course, this defense may also ultimately involve whether an interim order, as distinguished from a final order, may constitute such a defense.
 
 
 31
 We are of the view that the district court was premature in dismissing the claim of Atlanta Gas for damages arising out of the alleged breach of contract. We perceive the position of the district court to be that the court was without jurisdiction over the entire matter, including the breach of contract claim, because of the scheme of statutory regulation which vests regulatory power in the Commission. This seems to be somewhat broader than the doctrine of primary jurisdiction or the failure to exhaust administrative remedies.
 
 
 32
 We think that the course to be followed by the district court is dictated by Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486. That case was a private antitrust action for treble damages and injunctive relief. The complaint anticipated a defense implicating the validity of a tariff which purported to restrict the use of the contested device. We held that the question of the validity of the tariff was within the primary jurisdiction of the Federal Communications Commission and that the proper procedure for the district court to follow was to remand the case to the Federal Communications Commission for a determination of that issue, while retaining jurisdiction of the case.
 
 
 33
 Here, although the interim order was asserted as a basis for dismissal, it is clear that the question of validity vel non of the curtailment is still to be decided by the Commission. Given these facts, we hold that the better procedure is for the district court to retain jurisdiction over the claim for damages pending final decision by the Commission on the validity of the proffered curtailment plan. To this end, we vacate the order of the district court on the breach of contract claim.
 
 
 34
 We neither forecast nor foreclose the issues, if any, which may be presented in the district court, once the validity of the curtailment plan has been finally determined.[8]
 
 
 35
 In Nos. 72-1415 and 72-1475, the order of the Commission is affirmed. In No. 72-1539, the order of the district court is affirmed in part, and vacated and remanded in part for further proceedings consistent herewith.
 
 
 
 [1]
 15 U.S.C.A. Sec. 717c:
 (c) Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such from as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.
 (d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.
 (e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect, and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.
 
 
 [2]
 "Order Promulgating Statement of General Policy" in Docket No. R-418 (Order No. 431). The order provided in pertinent part:
 In 1970, the staff, having been directed, surveyed jurisdictional pipelines to determine whether adequate gas was available to the pipelines in order to fill storage fields in anticipation of the 1970-71 heating season and in anticipation of emergencies which would arise during the heating season if adequate gas supplies were not available to the consumer. It appearing to the Commission that supplies were not available, the Commission, acting pursuant to its emergency powers, promulgated Order 402 (35 F.R. 7511) and 402A (35 F.R. 8927) which authorized distribution companies to make resales of gas to other distribution companies and to jurisdictional pipelines in order to assure that the storage fields would be filled by winter and authorized the emergency purchases of gas from otherwise nonjurisdictional companies. This action was taken on May 6, 1970 and June 3, 1970. By notice of proposed rule-making issued October 6, 1970 and adopted December 10, 1970 the Commission amended Section 157.29 of its Regulations (Order No. 418, 35 F.R. 19173) to permit emergency purchases of gas by natural gas pipelines directly from gas producers. Notwithstanding these emergency measures, a number of natural gas pipelines indicated their inability to deliver sufficient gas to meet their firm demands. Because of the implementation of emergency purchases coupled with a winter of normal temperatures serious disruptions of service were not widespread.
 Sec. 2.70 Measures for the Protection of Reliable and Adequate Natural Gas Service.
 This Commission, charged with the responsibility for natural gas reliability, hereby promulgates as a statement of general policy that jurisdictional pipeline companies shall take all steps necessary for the protection of as reliable and adequate service as present supplies and capacities will permit during the 71-72 heating season and thereafter, including adequate injection into storage in anticipation of the heating season.
 In order to effectuate the foregoing:
 (1) During the storage injection season all natural gas pipelines subject to the jurisdiction of the Commission should make every reasonable effort to fill all storage fields supplied by such pipelines to a capacity sufficient to meet the anticipated heating season demands.
 (2) All jurisdictional pipelines will within 30 days hereof, submit a written report (four copies) to the Secretary of the Commission indicating how the instant statement of policy will be implemented. Pipelines responding that curtailment will be necessary will file a tariff sheet, pursuant to Sections 4 and 5 of the Natural Gas Act and the Commission's Regulations thereunder, setting forth a curtailment plan to effectuate the instant policy or state that the curtailment program if any, currently on file will effectuate this policy. The curtailment plan proposed may be divided between the injection season and the heating season, since different objectives may require different treatment.
 Consideration should be given to the curtailment of volumes equivalent to all interruptible sales and to the curtailment of large boiler fuel sales where alternate fuels are available.
 (3) The Commission recognizing that additional short-term gas purchases may still be necessary to meet the 1971-1972 demands, will continue the emergency measures referred to earlier for the stated 60-day period. If the emergency purchases are to extend beyond the 60-day period paragraph 12 in the Notice issued by the Commission on July 17, 1970, in Docket No. R-389A should be utilized (35 F.R. 11638). The Commission will consider limited term certificates with pre-granted abandonment, if the pipeline demonstrates emergency need, after complying with paragraphs 1 and 2, above.
 (4) Where emergency gas purchases are made and/or a curtailment program is instituted to implement the above policy the pipeline should place, or already have in effect, volumetric limitations on sales at current levels.
 (5) Notice should be taken that the Commission will re-examine existing commodity rate levels and, to the extent necessary, may redesign existing commodity-demand rate relationships in present and future pipeline rate cases.
 (6) Pipelines who can do so are encouraged to propose exchange arrangements with other pipelines.
 (7) Jurisdictional pipelines have the responsibility in the first instance to adopt a curtailment program by filing appropriate tariffs. Such tariffs, if approved by the Commission, will control in all respects notwithstanding inconsistent provisions in sales contracts, jurisdictional and non-jurisdictional, entered into prior to the date of the approval of the tariff.
 Nothing stated herein should be construed as placing a limitation on measures to be taken by jurisdictional pipelines to effectuate the instant policy.
 (B) The statement of general policy adopted herein shall be effective upon issuance of this order.
 
 
 [3]
 The Commission characterized the changes effected in the revised tariff sheets as follows:
 "The filing in Southern's response to our Order No. 431 and the changes contained in those tariff sheets represent Southern's proposed curtailment plan. The plan is divided into two parts, one for the storage injection period (April 1 through October 31) and the other applicable for the heating season (November 1 through March 31). Generally the storage injection plan involves these steps: (1) curtailment of deliveries of gas in excess of Contract Demand of a resale customer at each delivery point, or in excess of the firm requirements of direct consumers, where the gas is used or sold as fuel for electric generation in a plant where generation of electricity for sale represents the primary function of such plant; (2) curtailment of deliveries of gas in excess of the Contract Demand of a resale customer at each delivery point, or in excess of the firm requirements of direct consumers, where the gas is used or sold for interruptible use; (3) curtailment of remaining electric generation fuel requirements; (4) curtailment of remaining interruptible use requirements; (5) curtailment of firm industrial requirements; and (6) curtailment of remaining requirements. The heating season curtailment plan is similar to the storage injection curtailment plan except that (1) following the initial curtailment of gas used as fuel for electric generation on an individual delivery point basis, the remaining curtailment steps are on a group basis; and (2) systemwide conjunctive billing is permitted a multiple delivery point customer during the heating season when such customer is limited to a below Contract Demand or Maximum Delivery Obligation and the forecast mean temperature at Birmingham Alabama is 35~ Fahrenheit or lower." Order Suspending Proposed Tariff Sheets, December 23, 1972.
 
 
 [4]
 Georgia Power Company, Georgia Public Service Commission, and Savannah Electric and Power Company
 
 
 [5]
 The suspension order provided in pertinent part:
 "On November 24, 1971, Southern Natural Gas Company (Southern) tendered for filing under Section 4 of the Natural Gas Act revised tariff sheets to its FPC Gas Tariff, Sixth Revised Volume No. 1 and requested that those sheets become effective December 25, 1971, or, if suspended, that the period of suspension be limited to one day.
 "Protests have been filed to Southern's proposed curtailment plan and requests have been made that we suspend the plan for the full statutory period. We find that Southern's proposed plan has not been shown to be lawful and may be unjust, unreasonable, unduly discriminatory, or preferential, or otherwise unlawful under the Natural Gas Act. Consequently, we will suspend the tendered tariff sheets. Southern has stated that curtailments of firm service may be required during this heating season and its present tariff does not contain a curtailment procedure. Consequently, we believe that a one-day suspension period, as requested by Southern, is warranted in this case. . . ."
 
 
 [6]
 We do not reach the question whether a tariff revision of the type here involved is a "major federal action significantly affecting the quality of the human environment" within the jurisdictional meaning of the NEPA. Sec. 102(C). Title 42, Sec. 4332(C). Cf. Zabel v. Tabb, 5 Cir., 1970, 430 F.2d 199, 211
 
 
 [7]
 The other plaintiffs, Georgia Power Company, Savannah Electric and Power Company and the Georgia Public Service Commission, did not claim a breach of contract and thus do not claim damages
 
 
 [8]
 No question is presented in this case of a ruling by the Commission that Commission approval of a curtailment plan prevents a recovery for breach of contract, either because of the preference avoidance power of the Commission, 15 U.S. C.A. Sec. 717c (Sec. 4 of the Natural Gas Act), or otherwise. Cf. Louisiana Power & Light Co. v. Federal Power Commission, 5 Cir., 1973, 476 F.2d 132, this day rendered