TRANSWESTERN PIPELINE
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Nos. 78–1090, 79–3053.

United States Court of Appeals,
Fifth Circuit.

Oct. 2, 1980.

Rehearing Denied Nov. 5, 1980.

Vinson & Elkins, James W. McCartney, Houston, Tex., for petitioner.

Jerome Nelson, Sol., J. Paul Douglas, Washington, D. C., for respondent.

Martin A. Mattes, San Francisco, Cal., for The People of the State of California and the Public Utilities Commission of the State of California.

John H. Craig, III, Terminal Annex, Los Angeles, Cal., for intervenor.

Janice E. Kerr, J. Calvin Simpson, Martin A. Mattes, San Francisco, Cal., for The People of the State of California, et al.

Before CHARLES CLARK, RONEY and GARZA, Circuit Judges.

GARZA, Circuit Judge:

We have before us consolidated petitions for review of orders of the Federal Power Commission and its successor, the Federal Energy Regulatory Commission, rendered in two separately docketed Commission pro-

ceedings. The effect of these orders was to thwart the attempt of petitioner Transwestern to include its expenditures related to a coal gasification plant in its rate base, to be recovered in its rates.

Transwestern is a natural gas company operating an interstate pipeline from Texas-Oklahoma production areas to a point near Needles, California. It was a participant in the "WESCO" coal gasification project, which was to use the "Lurgi" gasification process. The plant was intended to have produced a synthetic gas with an energy component comparable to that of natural gas.[1] Transwestern notes that it has expended several millions of dollars in connection with the WESCO project.

Transwestern has sought to include its WESCO expenditures in the rate base as "research and development" [R&D], or "research, development and demonstration" [RD&D] expenditures,[2] which qualify for such treatment under the Commission's regulations.[3] The definition of RD&D is found at definition 28B of the Commission's Uniform System of Accounts, 18 C.F.R. part 201.[4] This case largely turns on the ques-

1. The project is more fully described in *Transwestern Pipeline Company, et al.,* 53 F.P.C. 1287 (1975). The plant appears never to have been completed and Transwestern in 1977 wrote off some $12.5 million in associated costs.

2. Prior to 1977, the Commission terminology was simply "research and development." In that year it was changed to "research development and demonstration." The latter term will be generally used in this opinion.

3. 18 C.F.R. § 154.38(d)(5)(v), which provides as follows:

(v) A natural gas pipeline company may submit a research, development and demonstration cost adjustment provision to flow through changes in its expenditures for research, development and demonstration. Changes permitted hereunder include both expenditures chargeable to operations as well as rate base treatment of the balances in account 188 as hereinafter defined. No RD&D adjustment provision shall become effective until authorization by the Commission. No request for RD&D adjustment provision will be considered by the Commission unless the proposed clause indicates the following terms and conditions.

(a) The RD&D expenditures adjustment shall be reflected in the company's rates only when it amounts to at least one-tenth of 1 mill ($0.0001) per thousand cubic feet of annual jurisdictional sales. Rate changes shall be applied to the commodity component of the existing rates of a pipeline company's two-part rates and to the volumetric rates of a pipeline company's one-part rates.

(b) Rate changes shall be computed and filed not more frequently than semi-annually. Rate changes by companies having Commission approved PGA clauses should be computed and filed to the extent practicable to coincide with the proposed effective date of a PGA rate change.

(c) Except in the case of expenditure approval pursuant to § 154.38(d)(5)(ii) RD&D expenditures chargeable to operations which may be tracked and reflected in rates shall be the amount which actual RD&D expenditures during the 12-month period ending 3 months prior to a proposed rate adjustment exceed or are less than (1) the amount allowed in the companies last rate proceeding or the average of 3 years RD&D expenditures if such rate adjustment is an initial filing under the subsection; or (2) the actual RD&D expenditures in the company's last prior rate adjustment under this section.

(d) RD&D expenditures in account 188 which are eligible to receive rate base treatment and which may be tracked and reflected in rates shall be the amount which the actual balances in such account during the 12-month period ending 3 months prior to the proposed rate adjustment exceed or are less than the balances in such account as of the date of this regulation, if an initial filing under this section, or the balances in account 188 included in the company's last prior rate adjustment under this subsection. For the purpose of determining the balance which may be tracked the company shall reduce the balance in account 188 by all moneys recorded in account 495 related to its RD&D expenditures and shall increase or reduce such account balance, as appropriate, by the applicable accumulated deferred income taxes. The rate of return used by the company to determine the rate effect of the rate base treatment of the balance in account 188 shall be the rate of return last allowed by the Commission during the previous 3-year period. If there has been no such rate of return allowed during the previous 3-year period, then, in the absence of evidence submitted to the contrary, the return utilized shall be the present interest rate used for computing refunds as specified in § 154.67.

4. Definition 28B currently reads:

B. "Research, Development, and Demonstration" (RD&D means expenditures incurred by natural gas companies either di-

tion of whether the definition includes "commercial-scale" demonstration projects, intended to show that a process is commercially feasible where it may have already been shown technologically feasible. Prior to 1973, the definition required an expenditure to "represent research and development in the experimental or laboratory sense." *Annual Reporting of Research and Development Activities*, 35 F.P.C. 820, 823–24 (1966). In 1973, the Commission broadened the definition in its Order No. 483, deleting the requirement that research and development be restricted to activities "in the experimental or laboratory sense." *Research and Development, Accounting and Reporting*, 49 F.P.C. 1045 (1973).[5]

Perhaps encouraged by the Commission's reference in the Order 483 change to "an experimental coal gasification plant" as an example of a facility possibly qualifying for RD&D treatment, Transwestern on March 14, 1975 filed a rate increase with the Commission which included costs related to the WESCO project as part of the rate base. The filing was docketed as Commission No. RP75–74. The Commission allowed the increase to go into effect subject to refund.

While the RP75–74 rate case was pending before it, the Commission, on June 17, 1976, issued a Notice of Proposed Rulemaking in which it proposed additional procedures and guidelines for the appropriate accounting and rate treatment of RD&D expenditures in Docket No. RP76–17. One of the stated purposes of the rulemaking was "to recognize participation in full-scale demonstration facilities, under certain conditions, as a justifiable R&D expenditure." Specific amendments to the definition of RD&D were not proposed.[6]

> The provisions of this proposed rulemaking augment current regulations dealing with application for advance approval of R&D expenditures, which is an *optional* procedure offered in Section 35.22, Subchapter B, Regulations Under the Federal Power Act, and Sec-

rectly or through another person or organization (such as research institute, industry association, foundation, university, engineering company, or similar contractor) in pursuing research, development, and demonstration activities including experiment, design, installation, construction, or operation. This definition includes expenditures for the implementation or development of new and/or existing concepts until technically feasible and commercially feasible operations are verified. Such research, development, and demonstration costs should be reasonably related to the existing or future utility business, broadly defined, of the public utility or licensee or in the environment in which it operates or expects to operate. The term includes, but is not limited to: All such costs incidental to the design, development or implementation of an experimental facility, a plant process, a product, a formula, an invention. a system or similar items, and the improvement of already existing items of a like nature; amounts expended in connection with the proposed development and/or proposed delivery of substitute or synthetic gas supplies (alternate fuel sources for example, an experimental coal gasificaton plant or an experimental plant synthetically producing gas from liquid hydrocarbons); and the costs of obtaining its own patent, such as attorney's fees expended in making and perfecting a patent application. The term includes preliminary investigations and detailed planning of specific projects for securing for custom-

ers non-conventional pipeline gas supplies that rely on technology that has not been verified previously to be feasible. The term does not include expenditures for efficiency surveys; studies of management, management techniques and organization; consumer surveys, advertising, promotions, or items of a like nature.

5. The relevant portions of the definition following the 1973 Order 483 change were as follows:

> 28B. "Research and Development" means expenditures incurred by natural gas companies * * * in pursuing research and development activities including experiment, design, installation, construction or operation. * * * The term includes but is not limited to: all such costs incidental to the design, development or implementation of an experimental facility, a plant process, a product, a formula, an invention, a system or similar items, and the improvement of already existing items of a like nature; amounts expended in connection with the proposed development and/or proposed delivery of substitute or synthetic gas supplies (alternate fuel sources for example, an experimental coal gasification plant or an experimental plant synthetically producing gas from liquid hydrocarbons) * * *. 49 F.P.C. at 1059–1060.

6. The commission specifically stated:

tion 154.38(d)(5), Subchapter E, Regulations Under the Natural Gas Act. It is not intended herein to alter the application of current regulations except in cases where application is made for advance assurance of rate treatment for R&D expenditures.

The Public Utilities Commission of the State of California, [California], the state agency entrusted with the regulation of natural gas subject to that state's jurisdiction, was "engaged in a controversy" with Transwestern over the qualification of WESCO expenditures for RD&D treatment. It filed comments following the issuance of the notice of proposed rulemaking, opposing any broadening of the scope of RD&D to include expenditures related to commercial-scale demonstration projects on the grounds that the projects could not be "properly classified as R&D," and that such treatment would require consumers to ultimately bear all risks. Transwestern notes that as it "had not elected to seek advance assurance," it "did not, therefore, file comments."

The result of the notice and comments was Order No. 566, issued in June 1977. The Commission agreed to the request of several parties for a "clarification" of the definition of research and development.[7] The Commission stated:

> .   .   .   we will add a sentence after the first sentence of  .   .   .  Definition 28.B Part 201 as follows: "This definition includes expenditures for the implementation or development of new and/or existing concepts until operations become technically and economically feasible."

> \*    \*    \*    \*    \*    \*

> An innovative commercial scale plant based on new technology proven on a pilot plant scale to be technically feasible, but not proven to be commercially feasible, could be considered 100% RD&D.

California petitioned for a rehearing of Order 566, expressing concern that the "clarification" would be held applicable to Transwestern's project. It asked that the Order be given prospective effect. On August 3, 1977, the Commission denied California's Motion for Rehearing, but in effect granted the relief sought. It characterized Order 566 as "expanding the definition of RD&D to include full-scale demonstration projects," but held that it:

> did not intend Order No. 566 to be applied so as to allow retroactive rate base treatment of amounts which would not be accorded such treatment under prior definitions of R&D. Rate base treatment and tracking of costs associated with commercial-scale demonstration projects are to be prospective from June 3, 1977, the date of issuance of Order No. 566.

Transwestern applied for rehearing and conditionally sought leave to intervene if formal party status were deemed necessary by the Commission. The Commission granted the conditional intervention for the purposes of consideration, but ruled that rehearing would not lie. It stated that Transwestern's pleading would be considered as a petition for reconsideration.

On January 9, 1978, the Commission denied "reconsideration" and Transwestern's attempted intervention. The Commission stated that the language of Order 566 did not specifically include or exclude expenditures on commercial-scale demonstration facilities. It stated that the Order had not changed the definition on the basis of which the issue in Transwestern's rate case was to be decided, and that the scope of the preorder 566 definition would be decided in that other docket. Finally, the Commission found that Transwestern was neither discriminated against nor denied due process, because the rulemaking was of general applicability.

---

**7.** The Commission stressed that it was not changing the definition:

> The Commission confirms that this rulemaking does *not* cancel or alter present practice. It *clarifies existing regulations* and adds an additional procedure for advance approval of RD&D programs.  .   .   .  The *existing definition of RD&D is not eliminated.* It will be *clarified* as previously discussed. [Emphasis Added].

Transwestern petitioned this court for review, the case being here numbered 78–1090. We initially ruled that "review of the Commission's orders may be premature at this time, especially in light of the pending rate case," and stayed further proceedings pending a Commission decision in the rate case. *Transwestern Gas Pipeline Company v. Federal Energy Regulatory Commission,* 589 F.2d 231 (5 Cir. 1978).

On December 22, 1977, an Administrative Law Judge made an initial determination in the rate case denying Transwestern's request for RD&D treatment of its WESCO expenditures. The Commission affirmed on June 25, 1979, in its Opinion No. 43. Transwestern petitioned for review and we consolidated the petition, No. 79–3053, with the prior petition from the rulemaking proceeding.

Transwestern brings a series of interrelated assignments of error. The company argues that the Commission erred by denying RD&D treatment of WESCO expenditures in its resolution of the rate case, using either the pre or post Order 566 definitions. Transwestern contends that it was discriminated against and denied due process by the Commission's "prospective only" application of Order 566. It asserts that the Commission by that Order merely "clarified" that commercial-scale projects qualified for RD&D treatment under the prior definition. The Commission is said to have erred in mandating a prospective application because it cannot, in Transwestern's view, "avoid the requirements of the Administrative Procedure Act nor engage in retroactive rulemaking by the issuance of what it denominates as 'prospective clarification.'" The company argues that it was subjected to discrimination and deprivation of due process by a Commission attempt to accommodate California's position by in effect barring Transwestern from the benefits of the Order 566 "clarification" while its rate case was pending. Thus, the "clarification" is said to be applicable to Transwestern's WESCO RD&D treatment request.

The Commission responds that Transwestern's petition for review of the rulemaking proceedings should be dismissed because the company was not aggrieved by the Commission's orders. It notes that "[T]he gravamen of Transwestern's brief is that the Commission discriminated against Transwestern by deciding a disputed issue in its rate case in this rulemaking."

[1] We agree with position of the Commission. In *Atlanta Gas Light Co. v. Federal Power Commission,* 476 F.2d 142 (5 Cir. 1973), we held:

The requirement that the reviewable order be "definitive" in its impact upon the rights of the parties is something more than a requirement that the order be unambiguous in legal effect. It is a requirement that the order have some substantial effect on the parties which cannot be altered by subsequent administrative action. See *Atlantic Seaboard Corp. v. Federal Power Commission,* 4 Cir., 1953, 201 F.2d 568. The additional condition of reviewability—the requirement that the order threaten "irreparable harm"—is, to that extent, redundant, since an "irreparable" injury, like the effect of a "definitive" order, cannot be redeemed by subsequent official action. See *Atlantic Seaboard Corp. v. Federal Power Commission,* supra at 572. 476 F.2d at 147.

Here, the Commission in its denial of Transwestern's petition for "reconsideration" clearly stated:

[J]ust because the substantive revisions of the Order No. 483 definition are effective prospectively, neither Transwestern nor [California] have been denied due process: There has been no change in the definition on the basis of which the issue in Docket No. RP75–74 is to be decided.

Transwestern did not, therefore, suffer the "irreparable" harm necessary to reviewability, for the Commission expressly reserved the question of its RD&D applicability claims for determination in the rate case. Any adverse effect the rulemaking proceedings had on Transwestern could clearly have been "altered by subsequent administrative action." For this reason, we reject

any argument that the company was denied due process in the rulemaking proceedings.[8]

With regard to the rate case petition, the Commission argues that prior to the issuance of Order 566, commercial-scale demonstration projects were not expressly included in the definition. That order is said to have definitely established the applicability of RD&D to such projects, expanding the definition. It is contended that the prospective application order was issued after the Commission, within its discretion, "recogn[ized] that the decision to extend R&D accounting and rate treatment to commercial-scale demonstration projects constituted an abrupt and significant departure from existing policy," with a possible adverse affect to others flowing from retroactive application. Thus it is argued that the Commission properly determined that the Order 566 "expansion" of the RD&D definition is inapplicable to the WESCO project, and that under the pre Order 566 definition, the project did not qualify for such treatment.[9]

█ Once again, we are compelled to agree with the Commission. It is obvious that Order 566 established, for the first time, the applicability of the RD&D definition to commercial-scale demonstration facilities. The Order expressly added "expenditures for the implementation or development of new and/or existing concepts

until operations become technically and economically feasible" to the definition.[10] *See generally Great Plains Gasification Associates, et al.*, Opinion No. 69, Docket Nos. CP78–391, et al. (Mimeo at 48–52); *Northern Natural Gas Co.*, Opinion No. 14, Docket Nos. RP72–127, et al. (Mimeo at 18–22). We believe that the Commission acted within its discretion in making the effect of Order 566 prospective. *See generally Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 201–204, 67 S.Ct. 1575, 1579–1581, 91 L.Ed. 1995 (1947); *Retail, Wholesale and Department Store Union v. National Labor Relations Board*, 466 F.2d 380, 389–90 (D.C.Cir.1972); *Pacific Molasses Company v. Federal Trade Commission*, 356 F.2d 386, 390 (5 Cir. 1966). The Commission could properly determine that an adverse affect on other parties could result from a retroactive application of the new definition. *Coe v. Secretary of Health, Education and Welfare*, 502 F.2d 1337, 1340 (4 Cir. 1974). Thus, as the Commission stated, Transwestern's claims must stand or fall under the rules as they stood prior to the amendment; it has no vested right to retroactivity.

Given the opportunity to advance its claims in the rate case, Transwestern did not succeed. Having concluded that commercial-scale demonstration projects were

8. Because we dismiss the petition for review from the orders in the Commission Docket No. RP76–17, we do not pass on Transwestern's other assignments of error in connection therewith.

9. The Commission's Opinion and Order expressly noted that the denial of RD&D treatment to Transwestern's WESCO expenditures was consistent with their recent opinion in *Northern Natural Gas Co.*, Docket Nos. RP72–127 and R&D 75–1, Op. No. 14 (May 10, 1978), *reh. denied*, Op. No. 14A (Sept. 14, 1978). There, the Commission denied Northern's request for RD&D treatment of expenditures made in connection with a commercial size gasification project that utilized the Lurgi process. The Commission first determined that the definition of RD&D applicable to the *Northern* proceeding was that contained in Order No. 483. *Id.* at 19–22. It next determined that the Lurgi process "is no longer experimental, nor is it novel or innovative." *Id.* at 24. The Commission therefore concluded that the project

was not an "experimental coal gasification plant" within the meaning of the operative definition and that the expenditures made in connection with such a project did not qualify for RD&D treatment. *Id.* at 27.

10. This conclusion is bolstered by the Commission's comments on denying California's application for rehearing of Order 566:

[C]ommercial feasibility refers to a determination that a technology proved in a pilot plant will be operable on a commercial scale as well. For our purpose, it does not refer to whether the cost of the final product will be low enough to make it competitive with other processes now, but it does refer to an evaluation that the cost of the final product will be reasonable at some future date. It is anticipated that the need for verification will require the construction of at least one demonstration plant.

not expressly made subject to RD&D treatment until the effective date of the Order 566 RD&D definition extension, we find no error in the Commission's refusal in the rate case to afford such treatment to Transwestern's WESCO expenditures. The consolidated petitions for review must be, accordingly, denied.

PETITIONS DENIED.