943 F.2d 1320
 291 U.S.App.D.C. 377
 WILLIAMS NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Texas Gas Transmission Corporation, Amoco Production
Company, Southern California Gas Company, Panhandle Eastern
Pipe Line Company and Texas Eastern Transmission
Corporation, Independent Oil and Gas Association of
Pennsylvania, Union Pacific Resources Company, ARCO Oil and
Gas Company, Division of Atlantic Richfield Company, Texaco,
Inc., Pennzoil Exploration and Production Company and
Pennzoil Gas Marketing Company, Enserch Exploration, Inc.,
National Association of Gas Consumers, Intervenors.
ARCO OIL AND GAS COMPANY, DIVISION OF ATLANTIC RICHFIELD
COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Williams Natural Gas Company, Independent Oil and Gas
Association of West Virginia and Pennsylvania Natural Gas
Association, Panhandle Eastern Pipe Line Company and Texas
Eastern Transmission Corporation, Intervenors.
 Nos. 90-1193, 90-1255.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 2, 1991.
Decided Sept. 6, 1991.
 
 [291 U.S.App.D.C. 379] Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 Michael E. Small, with whom Robert G. Kern, Washington, D.C., and John H. Cary, Tulsa, Okl., were on the brief, for petitioner Williams Natural Gas Co. in 90-1193, and intervenor in 90-1255.
 Kevin M. Sweeney, with whom Craig W. Hulvey, Frank H. Markle, Washington, D.C., and Charles F. Hosmer, Dallas, Tex., were on the brief, for petitioner ARCO Oil and Gas Co. in 90-1255, and intervenor in 90-1193.
 Samuel Soopper, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, FERC, and Jerome M. Feit, Solicitor, FERC, Washington, D.C., were on the brief, for respondent in 90-1193 and 90-1255. Dwight C. Alperin, Atty., FERC, [291 U.S.App.D.C. 380] Washington, D.C., also entered an appearance for respondent.
 
 
 1
 Robert W. Perdue, Washington, D.C., for Texas Gas Transmission Corp., Charles F. Wheatley, Jr. and Philip B. Malter, Annapolis, Md., for The Nat. Ass'n of Gas Consumers, were on the joint brief, for intervenor in 90-1255.
 
 
 2
 James D. Senger, Katherine C. Zeitlin, and Jon L. Brunenkant, Washington, D.C., for Amoco Oil Co., David B. Robinson, Washington, D.C., and Kerry R. Brittain, Fort Worth, Tex., for Union Pacific Resources Co., John P. Beall, Houston, Tex., for Texaco, Inc., Richard E. Powers, Washington, D.C., and John B. Chapman, Houston, Tex., for Pennzoil Exploration and Production Co. and Pennzoil Gas Marketing Co., and Charles H. Shoneman and Randall S. Rich, Washington, D.C., for Independent Oil & Gas Ass'n of W. Va. and Independent Oil & Gas Ass'n of Pa., were on the joint brief, for intervenor in support of the respondent in 90-1193. Stephen A. Ellis, Chicago, Ill., and William H. Emerson, Tulsa, Okl., for Amoco Production Co. also entered appearances, for intervenors.
 
 
 3
 David L. Huard, Los Angeles, Cal., entered an appearance for intervenor Southern California Gas Co. in 90-1193.
 
 
 4
 Frank R. Lindh, Bruce W. Neely, Raymond N. Shibley, Washington, D.C., John S. Grube, and John C. Tweed, Houston, Tex., entered appearances for intervenors Panhandle Eastern Pipe Line Co. and Texas Eastern Transmission Corp. in 90-1193 and 90-1255.
 
 
 5
 Craig W. Hulvey, Kevin M. Sweeney, and Frank H. Markle, Washington, D.C., entered appearances for intervenor Enserch Exploration, Inc. in 90-1193.
 
 
 6
 Randall S. Rich and Charles H. Shoneman, Washington, D.C., entered appearances, for intervenor Independent Oil & Gas Ass'n of West Va. in 90-1255.
 
 
 7
 Before EDWARDS, D.H. GINSBURG and SENTELLE, Circuit Judges.
 
 
 8
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 
 
 9
 Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.
 
 D.H. GINSBURG, Circuit Judge:
 
 10
 Under section 107 of the Natural Gas Policy Act, 15 U.S.C. § 3317, the Federal Energy Regulatory Commission may establish an especially high ceiling price for natural gas recovered from high-cost sources, in order to provide an incentive for the development of those sources. In 1980, the FERC exercised this power and set an incentive ceiling price for gas produced from tight formations of sedimentary rock. See Order No. 99, Regulations Covering High-Cost Natural Gas Produced From Tight Formations, 45 Fed.Reg. 56,034, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,183, clarified and reh'g denied, Order No. 99-A, 45 Fed.Reg. 71,563, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,198 (1980), aff'd sub nom. Pennzoil Co. v. FERC, 671 F.2d 119 (5th Cir.1982).
 
 
 11
 Although the FERC considered changing the ceiling in a 1983 Notice of Proposed Rulemaking, Limitation on Incentive Prices for High-Cost Gas to Commodity Values, 48 Fed.Reg. 7469, 1982-1987 F.E.R.C. Stat. & Regs. [Proposed Regs.] p 32,294 (Notice ), the Commission abandoned that rulemaking docket in 1986, giving only a few short paragraphs of purported explanation. Order No. 459, Basket Termination Order, 51 Fed.Reg. 44,634, 1982-1987 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 32,432 (1986), reh'g denied, Order No. 459-A, 42 F.E.R.C. p 61,146 (1988). We found the FERC's explanation inadequate and remanded. Williams Natural Gas Co. v. FERC, 872 F.2d 438 (D.C.Cir.1989) (Williams I ). On remand the Commission decided that the higher ceiling for gas from tight formation wells would not apply to wells going into production after May 12, 1990. See Order No. 519, Limitation on Incentive Prices for High-Cost Gas to Commodity Values, 55 Fed.Reg. 6367, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,879, reh'g denied, Order No. 519-A, 55 Fed.Reg. 18, [291 U.S.App.D.C. 381] 100, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,888 (1990).
 
 
 12
 Petitioners ARCO Oil and Gas Company and Williams Natural Gas Company respectively claim that the FERC is obliged by statute to leave the higher ceiling in place until a later date and to remove it as of an earlier date. We find that the Commission's choice of timing for the removal of the incentive ceiling price was within its discretion, and deny both petitions.
 
 I. BACKGROUND
 
 13
 The NGPA sets a variety of price ceilings for wellhead sales of natural gas, according to the age, type, and contract status of the producing well. The wellhead pricing scheme was designed to provide producers with an incentive to develop gas from "sources that otherwise would not be produced." ANR Pipeline Co. v. FERC, 870 F.2d 717, 721 (D.C.Cir.1989). In order to encourage the exploration and development of new sources, gas produced from a well drilled after enactment of the NGPA can command a much higher price than gas from an old well. Compare §§ 102-103, 15 U.S.C. §§ 3312-3313 (new gas) with §§ 104, 106, 15 U.S.C. §§ 3314, 3316 (old gas); 18 C.F.R. § 271.101. (Statutory citations refer to the NGPA unless otherwise specified.) An even higher price is authorized for gas from small volume, so-called "stripper" wells, in order to keep them in production. See § 108, 15 U.S.C. § 3318.
 
 
 14
 The Congress itself defined the basic categories and set most of the original price ceilings in the text of the statute. In order to "establish[ ] a statutory price path[, and] ... thereby assur[e] producers of certainty regarding the level of future prices," H.R. REP. NO. 496, pt. 4, 95th Cong., 1st Sess. 96 (1977), the Congress also indexed the ceiling prices to inflation. § 101(a), 15 U.S.C. § 3311(a); see H.R.CONF.REP. NO. 1752, 95th Cong., 2d Sess. 72 (1978), U.S.Code Cong. & Admin.News 1978, 8800 (explaining compromise decision to use inflation index rather than earlier proposals).
 
 
 15
 In addition to setting out a detailed system of classifications and price ceilings in the NGPA, the Congress authorized the FERC to set a higher price ceiling for any gas that is particularly expensive to produce. Section 107(b) provides:
 
 
 16
 The Commission may, by rule or order, prescribe a maximum lawful price ... [for] any first sale of any high-cost natural gas, which exceeds the otherwise applicable maximum lawful price to the extent that such special price is necessary to provide reasonable incentives for the production of such high-cost natural gas.
 
 
 17
 18 U.S.C. § 3317(b). Although § 107 enumerates four types of "high-cost gas" to be deregulated in October 1979, §§ 107(c)(1)-(4), 121(b), 15 U.S.C. §§ 3317(c)(1)-(4), 3331(b), it also delegates further authority to the FERC, without any timing limitation, to prescribe an incentive ceiling price for any other natural gas "produced under such other conditions as the Commission determines to present extraordinary risks or costs." § 107(c)(5), 15 U.S.C. § 3317(c)(5); see H.R.CONF.REP. NO. 1752, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, 8800, 8983, 9004. Unlike the four varieties of high-cost gas specified in the statute, gas within a discretionary, FERC-created category could remain indefinitely subject to regulation, but at the higher price.
 
 
 18
 A. The Special Incentive Ceiling Price for Gas From Tight Formations
 
 
 19
 In 1980, the FERC (in Order No. 99 ) identified gas produced from tight formations as high-cost gas under § 107(c)(5). "A 'tight formation' is a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock." Order No. 99, 45 Fed.Reg. at 56,034, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,260. Gas from tight formations is very expensive to produce, and the pay-off from its production is longer in coming. See id., 45 Fed.Reg. at 56,035, 56,039, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,260, 31,268. Whereas a conventional well produces a high yield for five to seven years, id., 45 Fed.Reg. at 56,039, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,268, a tight formation well produces [291 U.S.App.D.C. 382] at a high rate for a year or two and at a low rate for 15 to 20 years thereafter; as a result, a tight formation well may take three times as long to produce the same amount of gas as a conventional well. See id.
 
 
 20
 The Commission set the incentive ceiling price for tight formation gas at the lesser of the purchase contract price or twice the ceiling for § 103 gas from new, onshore production wells. Id., 45 Fed.Reg. 56,034, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,183 (rules codified as amended at 18 C.F.R. §§ 271.701-.703, 274.205(e) (1990)). The Commission chose the doubled § 103 ceiling as an outside limit after considering the costs and benefits of developing tight formation gas as compared with other NGPA categories of gas. Id., 45 Fed.Reg. at 56,038-40, 1977-1981 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,267-70.
 
 
 21
 In order to identify gas for which the availability of a higher price provided a "reasonable incentive" "necessary" to stimulate production of the gas, the Commission imposed a "negotiated contract price requirement" (NCPR). Id., 45 Fed.Reg. at 56,040-41, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,271-73. Under the NCPR, a producer may not collect a price above the ceiling otherwise applicable under the Act unless the purchaser expressly agrees thereto, either by reforming an existing gas purchase contract or by entering into a new supply contract; and the price term must either provide for a fixed price (or a price escalating to fixed amounts on fixed dates) or refer specifically to the Commission's authority to prescribe a § 107 incentive ceiling price. A general reference to the regulated price, or even to the NGPA ceiling price, is not enough.
 
 
 22
 The FERC reasoned that because a purchaser would not agree to pay a higher price if the gas would still be produced at the lower price, the NCPR guaranteed that the incentive price was "necessary" to the production of the particular gas for which it was paid. Id., 45 Fed.Reg. at 56,041, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,272-73. Further, the FERC believed that market forces operating through the NCPR would ensure that the incentive would be "reasonable" rather than excessive because a purchaser would not agree to pay more than its worth for a supply of gas. See Pennzoil, 671 F.2d at 127.
 
 
 23
 Some pipelines refused to renegotiate their contracts, and continued to pay prices limited by the "otherwise applicable" NGPA ceilings. See, e.g., South Dakota Pub. Utils. Comm'n v. FERC, 934 F.2d 346, 352 (D.C.Cir.1991). Other pipelines agreed to reform existing agreements or entered into new contracts designed to meet the NCPR in order to secure supplies of gas, even if it meant paying the full ceiling price, with its periodic inflation adjustment, for the duration of a long-term contract. In essence the pipelines contracted to buy tight formation gas at a price fixed in constant dollars. As it turned out, this strategy
 
 
 24
 committed [them] to purchase large volumes of gas at prices many times the market price under contracts that provided them no protection from potential declines in the market value of gas. By choosing this course, these pipelines maximized their profits in the short-term, but exposed themselves to risks in the long-term.
 
 
 25
 Pierce, Reconstituting the Natural Gas Industry from Wellhead to Burnertip, 9 ENERGY L.J. 1, 40 (1988). The willingness of those pipelines to accept the mandated price ceiling as the price floor in their purchase agreements is not as counter-intuitive as it might appear at first blush: "As the ceilings would bind if they were below market, at the expense of producers, it is hardly surprising for the parties to have agreed that pipelines should bear the opposite risk." South Dakota Pub. Utils. Comm'n, 934 F.2d at 352.
 
 B. The Rulemaking Docket Under Review
 
 26
 The market price of natural gas began to decline in 1982. Early the next year, the FERC questioned the continuing desirability of a high and steadily escalating tight [291 U.S.App.D.C. 383] formation incentive ceiling price. See Notice, 48 Fed.Reg. 7469, 1982-87 F.E.R.C. Stat. & Regs. [Proposed Regs.] p 32,294 (Feb. 22, 1983). In the Notice, the agency set out two possible methods for capping the incentive ceiling price by tying it to the commodity value of alternative fuels. The agency proposed to amend the incentive price rule of Order No. 99 prospectively, that is, for gas from wells drilled (or "recompleted," see 18 C.F.R. § 271.703(b)(3)) after the publication date of the Notice. The Commission announced, however, that it was also considering whether to apply any new rule to cap future prices for all tight formation gas produced after the rule became effective.
 
 
 27
 The Commission received comments and held a hearing to evaluate the proposed new rule, but it did not act. In the meantime, most new gas was deregulated on January 1, 1985, according to the phased deregulation schedule in the NGPA. § 121(a), 15 U.S.C. § 3331(a). The FERC held that any tight formation gas that qualified for inclusion both in a deregulated category of new gas and in a § 107(c)(5) category of high-cost gas would be deregulated pursuant to the statutory scheme. See Order No. 406, Deregulation and Other Pricing Changes, 49 Fed.Reg. 46,874, 1982-1985 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,614 (1984), aff'd, FERC v. Martin Exploration Management Co., 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988). In this way, most tight formation gas passed outside the reach of the special incentive or of any other ceiling price in 1985. See also § 121(c); 15 U.S.C. § 3331(c) (deregulating more new gas in 1987).
 
 
 28
 In 1986, after three years of inaction on the Notice, the Commission tersely announced its decision to terminate the rulemaking docket. Order No. 459, 51 Fed.Reg. 44,634, 1982-1987 F.E.R.C. Stat. & Regs. [Proposed Regs.] p 32,432 (1986), reh'g denied, Order No. 459-A, 42 F.E.R.C. p 61,146 (1988). The agency said only the statutory deregulation of 1985 and other changed circumstances had made it unnecessary to revise the tight formation incentive ceiling price, at least in the absence of more recent and more compelling information.
 
 
 29
 Two pipelines petitioned this court for review. We found that the FERC did not adequately "consider the comments it received" or "articulate a reasoned explanation for its decision," and so we remanded for the agency to consider further its decision to terminate the rulemaking. Williams I, 872 F.2d at 450. Having made statements in the Notice that "appeared to reflect the ... tentative view that the ... continued implementation [of the incentive ceiling price] would ... be contrary to the NGPA," id., the Commission, we said, was "not free to terminate the rulemaking for no reason whatsoever." Id. at 446. We emphasized, however, that the FERC retained "wide discretion on remand." Id. at 450. "[T]he agency's articulation of [its prior] belief did not obligate it to alter the incentive price for tight formation gas," nor did the tentative findings in the Notice bind it "if further reflection, or changed circumstances, convinced the Commission that no regulatory change was warranted." Id.
 
 
 30
 On remand the Commission explained that in its current view the 1983 Notice reflected a misconception of the incentive price scheme authorized by the statute. Contrary to the premise underlying the Notice, the agency said, "[A]n incentive price by its very nature is expected to be above the otherwise applicable ceiling price." Order No. 519, 55 Fed.Reg. at 6374, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,675. The agency held that "the incentive ceiling price as it has existed" remained reasonable and necessary. Id., 55 Fed.Reg. at 6376, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,678.
 
 
 31
 In light of the complete deregulation of newly-spudded wells that would occur on May 15, 1991 under the Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101-60, 103 Stat. 157, see 18 U.S.C. 3331(d), however, the higher ceiling could not be justified for still-undeveloped supplies of gas. Therefore the FERC decided to rescind the higher ceiling for wells spudded after May 12, 1990, the effective date of its [291 U.S.App.D.C. 384] new tight formation incentive price rule. The FERC left the higher ceiling in place for gas flowing before that date. See Order No. 519, 55 Fed.Reg. 6367, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,879, reh'g denied, Order No. 519-A, 55 Fed.Reg. 18,100, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,888 (1990) (amending 18 C.F.R. § 271.703). (Under the Wellhead Decontrol Act, flowing gas remains regulated until January 1, 1993, unless its contractual status changes before then. See Pub.L. No. 101-60, § 2, 103 Stat. 157, codified in part at 15 U.S.C. § 3331(f).)
 
 
 32
 ARCO Oil and Gas Company, a producer of tight formation gas, petitions for review, arguing that the Commission lacks the power to deny the incentive ceiling price to wells drilled at any time before May 15, 1991. Williams Natural Gas Company, a pipeline that had contracted to buy tight formation gas, also petitions for review, but it argues that, on the contrary, the NGPA compels the Commission to lower the ceiling retroactively for all gas flowing as of February 22, 1983, or alternatively to some later date but not as late as May 12, 1990.
 
 II. ANALYSIS
 
 33
 In Williams I the court considered a record in which the FERC had collected comments but failed to analyze them, and decided to take no action but failed to explain its decision. In the decision then under review, the agency had attempted to leave the tight formation incentive ceiling rule in place with the support of only a few conclusory sentences and without offering any coherent interpretation of § 107(b). Indeed, as we pointed out, 872 F.2d at 445-46, the Commission's last word on the statute had been the "tentative conclusion" in the Notice with which it had opened this proceeding in 1983.
 
 
 34
 Because the Commission was "intolerably mute," Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), the court was left to evaluate as best it could the validity of the petitioners' argument that the agency's inaction was not justified. Hence, our decision in Williams I established only--and could establish only--that the orders under review were not self-evidently justified. The Commission would have to lay out for the court its understanding of the statute and its rationale for the result it would reach. This the Commission has now done and the case returns to us in a very different posture. We are moved to remark, nonetheless, that the FERC itself invited our rebuff in Williams I, added years of uncertainty to the price regulation of tight formation gas, and squandered court and Commission time alike.
 
 
 35
 On remand, the Commission chose a new course of action based in part upon intervening events, and explained its decision in two orders that span more than twenty pages of the Federal Register. It set out its interpretation of the statute, explained its choice of policies within the statutory framework, and proffered factual support therefor. Thus, as we approach the question now before us--the adequacy of the FERC's enhanced response--we write upon a clean slate. See Cross-Sound Ferry Servs., Inc. v. ICC, 934 F.2d 327, 330 (D.C.Cir.1991) ("it would be inappropriate to let our earlier expressions of puzzlement prevent a subsequent panel from evaluating the Commission's newly tendered explanations de novo").
 
 
 36
 We also recognize that we owe an appropriate deference to the agency charged with the specialized and highly technical regulation of natural gas. "Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts." Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). The FERC's regulation carries a "presumption of validity," and we impose a corresponding "heavy burden" upon those who would overturn it. Id.
 
 
 37
 The instant challenges require us to survey the boundaries of the FERC's authority under § 107 to prescribe, maintain, or rescind the incentive ceiling price for tight formation gas. The statutory provision [291 U.S.App.D.C. 385] simply delegates to the Commission the power to "prescribe" an incentive ceiling price "which exceeds the otherwise applicable maximum lawful price to the extent that such special [ceiling] price is necessary to provide reasonable incentives for the production of such high-cost natural gas." § 107(b), 15 U.S.C. § 3317(b).
 
 
 38
 As the Fifth Circuit noted in affirming the tight formation incentive ceiling price regulation:
 
 
 39
 The authority delegated by Congress [in § 107] was broad indeed: responsibility for both the identification of gas to which such incentives should be extended and the determination of the appropriate maximum lawful incentive price devolved upon FERC. Sparse guidelines incorporated in the statutory mandate established only the broad parameters of regulation. The remainder was left to FERC's reasoned application of its considerable experience and accrued expertise.
 
 
 40
 Pennzoil, 671 F.2d at 126; see Midwest Gas Users Ass'n v. FERC, 833 F.2d 341, 352-53 (D.C.Cir.1987). As for that "remainder," we note that the Congress did not in any way restrict the criteria for deciding when a higher ceiling is "necessary" to provide such an incentive; nor did it set any limit upon the level or the duration of the incentive ceiling price that the FERC could consider "reasonable."
 
 
 41
 Where, as here, the "Congress has explicitly left a gap for the agency to fill," this court must give the resulting regulation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). In interpreting the NGPA in particular, we "accord the 'view of the agency charged with administering the statute ... considerable deference.' " Office of Consumers' Counsel v. FERC, 783 F.2d 206, 218 (D.C.Cir.1986) (quoting Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985)).
 
 
 42
 In addition, the NGPA requires us to defer to the agency on questions of fact: "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." § 506(a)(4), 15 U.S.C. § 3416(a)(4). The substantial evidence standard and the "arbitrary [or] capricious" criterion " 'tend to converge' in [a] notice-and-comment rule making," such as we now review. American Public Gas Ass'n v. FPC, 567 F.2d 1016, 1028-29 (D.C.Cir.1977) (APGA ); see also Mid-Tex Elec. Co-op., Inc. v. FERC, 773 F.2d 327, 338 (D.C.Cir.1985). "What is basic is the requirement that there be support in the public record for what is done." APGA, 567 F.2d at 1029 (citation omitted).
 
 
 43
 It is with these deferential standards in mind that we now evaluate the petitions for review.
 
 A. ARCO's Petition
 
 44
 ARCO claims that both the Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101-60, 103 Stat. 157, and the Internal Revenue Code constrain the FERC from rescinding the tight formation incentive ceiling price for wells drilled after May 12, 1990. We take these points up in turn below. ARCO also argues that the FERC's decision was not supported by substantial evidence, and that the agency did not comply with the notice and comment provisions of the Administrative Procedure Act. The former claim is insubstantial, and the latter claim, upon which we withhold comment, is barred by the petitioner's failure to raise it on rehearing before the Commission, § 506(a)(4), 15 U.S.C. § 3416(a)(4); see ASARCO, Inc. v. FERC, 777 F.2d 764, 773-74 (D.C.Cir.1985) (party seeking judicial review must have raised issue in petition for rehearing before Commission); Interstate Natural Gas Ass'n of Am., Inc. v. FERC, 716 F.2d 1, 15-16 (D.C.Cir.1983) (applying § 506(a) to rulemaking under NGPA).
 
 1. The Natural Gas Wellhead Decontrol Act
 
 45
 The Natural Gas Wellhead Decontrol Act of 1989 lifts all remaining NGPA price ceilings as of January 1, 1993. [291 U.S.App.D.C. 386] Pub.L. No. 101-60, § 2(b), 103 Stat. 157, 15 U.S.C. § 3311 note. As of May 15, 1991, however, the Act deregulates the price of gas produced from wells drilled after July 26, 1989. Id. § 2(a), 15 U.S.C. § 3331(f)(4). ARCO contends that the Decontrol Act clearly expresses the Congress's intent that the discretionary incentive ceilings imposed under § 107 remain in place until May 15, 1991, and so deprives the FERC of the power to lower the tight formation ceiling as of an earlier date.
 
 
 46
 The Decontrol Act does not support ARCO's claim; it simply deregulates new wells in these terms: "The provisions of part A [of NGPA Title I, which includes § 107] respecting the maximum lawful price for a first sale of natural gas shall cease to apply ... as follows[.]" Id. § 2(a), 15 U.S.C. § 3331(f) (setting out schedule for deregulation of newly-spudded wells, among others). The Act does not purport to limit the FERC's continuing exercise of discretion under Part A, nor can any limit reasonably be inferred. We recognized in Williams I that the FERC may, at any time as far as § 107 is concerned, reexamine the reasonableness and necessity of a special incentive ceiling price. See 872 F.2d at 445-48; see also Order No. 519-A, 55 Fed.Reg. at 18,104, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,774. ARCO points to nothing in the subsequent legislation or its history that reflects a congressional intent to modify § 107 in the interim pending its scheduled repeal.
 
 2. Investment Tax Credit
 
 47
 ARCO contends that the FERC's decision exceeds the agency's statutory authority because it conflicts with the Internal Revenue Code. ARCO discerns a conflict because the removal of the incentive ceiling makes gas produced from certain tight formation wells ineligible for the investment tax credit afforded by 26 U.S.C. § 29. When the FERC issued Order No. 519, the ITC was available for investments in new tight formation "gas for which the maximum lawful price applicable under the [NGPA] is at least 150 percent of the then applicable price under section 103 of such Act." 26 U.S.C. § 29(c)(2)(B)(ii) (1989); id. § 29(d)(4)(A). (The ITC is an alternative to the higher ceiling price. Id. § 29(e)(1); NGPA § 107(d), 15 U.S.C. § 3317(d).)
 
 
 48
 The FERC realized that, as a collateral effect, Order No. 519 would make gas from newly-spudded tight formation wells ineligible for the ITC because that gas would not be subject to a sufficiently high ceiling price. Specifically in order to smooth the way for a potential amendment to the ITC eligibility provision, however, the FERC left in place its regulations covering the identification of tight formation wells. Order No. 519-A, 55 Fed.Reg. at 18,106, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,778.
 
 
 49
 The congressional response is instructive. No bill to reverse the regulatory effect of Order No. 519 was introduced. On the contrary, the Congress left the agency's regulatory decision in place while extending the ITC to gas produced from any tight formation gas well, identified according to the regulations that the FERC had preserved, if that gas "as of April 20, 1977, was committed or dedicated to interstate commerce ... or ... is produced from a well drilled ... after December 31, 1990." Pub.L. No. 101-508, § 11501, 104 Stat. 1388-479 (1990) (amending 26 U.S.C. § 29(c)(2)(B)).
 
 
 50
 ARCO points out that a tight formation well drilled between May 12, 1990 and January 1, 1991 qualifies for neither the ceiling-based ITC nor the amended and now calendar-based ITC. While this gap in coverage may seem unfair to the producers that fall into it, it reflects the Congress's conscious decision how best to accommodate the ITC to the rule here under review. Cf. S. 2288, 101st Cong., 2d Sess., 136 CONG.REC. S2641 (daily ed. March 9, 1990) (bill that would have applied ITC to any tight formation well drilled after May 12, 1990); 136 CONG.REC. S2640-41 (daily ed. March 9, 1990) (statement of Sen. Domenici) (introducing S. 2288 and decrying tax effects of Order No. 519 ). The grievance of a producer disadvantaged by the incomplete coverage of the ITC lies not with the FERC's rule, therefore, but with the response of the Congress.[291 U.S.App.D.C. 387] B. Williams' Petition
 
 
 51
 On remand, the Commission's burden was generally to explain its inaction (if it did not decide to act after all) in light of its tentative findings in the Notice, and in particular to consider whether to rescind the incentive ceiling price retroactively. We warned too that the agency "may not pretend that a change in the incentive price with an effective date in 1989 is equivalent to a change in the ceiling with an effective date of February 22, 1983," id. at 451 n. 11, but we did not mandate that the agency change the ceiling price as of either date, or at all, as long as it adequately explained its choice.
 
 
 52
 Of the courses open to it on remand, the Commission chose the most direct: It determined that the analysis in the Notice fundamentally misconceived the nature of a special incentive ceiling price under § 107:
 
 
 53
 [T]he NOPR rests on reasoning that cannot be supported: An incentive ceiling price is not in the public interest if it is above the "commodity value" for natural gas at the wellhead at any particular time; the incentive ceiling price has been above this commodity value; the incentive ceiling price is therefore against the public interest.
 
 
 54
 Order No. 519, 55 Fed.Reg. at 6374, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,675. The agency instead recognized that the incentive ceiling price must be understood, in the context of the other ceiling prices in the NGPA, as a device for shifting producer investment away from gas that can be extracted more cheaply and into gas that can be sold more dearly. Echoing the words of the statute, the Commission declared, "In fact, an incentive price by its very nature is expected to be above the otherwise applicable ceiling price." Id.; see 15 U.S.C. § 3317(b) (authorizing Commission to prescribe special incentive ceiling price "which exceeds the otherwise applicable maximum lawful price").
 
 
 55
 To cap the allowable price for tight formation gas at the average market price for an alternate energy source, as was proposed in the Notice, would provide no incentive at all to develop a high-cost source of gas rather than tapping some cheaper source: a producer with higher-than-average expenses could never receive a higher-than-average price. The Congress designed the special incentive price scheme so that the potential for higher (contractual) income could be used to encourage producers to develop certain higher cost sources of gas rather than other, lower cost sources. See id., 55 Fed.Reg. at 6374-75, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,675-76.
 
 
 56
 As the Commission also pointed out, a ceiling price tied to the volatile price of an alternate fuel would not provide a "stable and predictable incentive." Id. Stability and predictability are core values underlying the NGPA pricing scheme, as appears from the steadily and more or less predictably escalating ceilings set out in the statute itself, and as is made express in the legislative history, e.g., H.R.REP. NO. 496, pt. 4, 95th Cong., 1st Sess. 96 (1977) ("Certainty and stability of future prices are more important than the initial price level"). See H.R.CONF.REP. NO. 1752, 95th Cong., 2d Sess. 72 (1978), reprinted in 1978 U.S.CODE CONG. & ADMIN.NEWS 8989 (1978) (inflation escalator replaced commodity-based adjustment system).
 
 
 57
 Having disavowed the tentative view of § 107 expressed in the Notice, the Commission was not obliged to assess the continuing validity of the tight formation incentive price according to the conception, integral to that Notice, that an incentive price above the commodity value of the gas is impermissible. See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 845, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1986) (because it "goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound," it would be "antithetical to the purposes of ... notice and comment" rulemaking "to tax an agency with 'inconsistency' whenever it circulates a proposal that [291 U.S.App.D.C. 388] it has not firmly decided to put into effect and that it subsequently reconsiders in response to public comment"). And upon taking a fresh look at the tight formation incentive ceiling price, the agency found that, until early 1990, it was not inconsistent after all with the "reasonable" and "necessary" standards of § 107(b) of the NGPA.
 
 
 58
 Williams challenges the agency's decision on a variety of grounds. We address here only those elements of the challenge that are not plainly without merit.
 
 
 59
 1. Necessity and Reasonableness: Special Incentive Price, 1983-1990
 
 
 60
 Williams maintains that the special incentive ceiling price was unreasonable and unnecessary for flowing gas and for wells drilled between February 22, 1983 (when the FERC proposed to modify the incentive ceiling price) and May 12, 1990 (as of when the FERC ultimately rescinded it). We deal separately with the subsidiary periods before and after the passage of the Decontrol Act in July 1989.
 
 
 61
 a. Before the Decontrol Act
 
 
 62
 Because the NGPA provides neither an implicit nor an explicit definition of the terms "reasonable" or "necessary," we conclude that the Congress "has left the task of defining th[ose] term[s] to FERC," National Fuel Gas Supply Corp. v. FERC, 900 F.2d 340, 344 (D.C.Cir.1990). We consider whether the content that the agency has given them is "permissible" in the sense that term has in Chevron v. NRDC, 467 U.S. at 843, 104 S.Ct. at 2781, bearing in mind that the words "reasonable" and "necessary" are among the broadest in the congressional lexicon of delegation, and that the FERC's interpretation need only "be grounded in some economic basis" to pass muster. Midwest Gas, 833 F.2d at 351.
 
 
 63
 As we have seen, in Order No. 99 the FERC instituted the negotiated contract price requirement as a market-based mechanism for ensuring that the incentive ceiling price would be reasonable (else no one would agree to pay it) and necessary (else a producer would sell the gas at a price within the otherwise applicable ceiling rather than leave it in the ground). The NCPR protected the purchaser from a price suddenly escalating from the regular to the special incentive ceiling; it enabled a producer to get a price above the otherwise applicable ceiling only if the purchaser had agreed specifically to pay a price with a relatively predictable upper limit. With respect to the cost of gas, at least, the future was made (reasonably) foreseeable.
 
 
 64
 On direct review, the Fifth Circuit approved the FERC's idea of using the NCPR to ensure that any incentive price paid was "reasonable" and "necessary" under § 107(b). Pennzoil Co. v. FERC, 671 F.2d 119 (5th Cir.1982). Indirectly, so did we, see Midwest Gas, 833 F.2d at 351, 361, though we also required the Commission to scrutinize with special care the validity of a contract price "negotiated" between a pipeline (in fact, it was our present petitioner, Williams) and a producer in which the pipeline had a financial interest. Id. at 350-51.
 
 
 65
 Although in Williams I we intimated that "the presumption that a validly promulgated regulation remains valid" may not apply where "the agency itself has called into question the propriety of its own regulation," 872 F.2d at 445, we also acknowledged that in this proceeding "[t]he agency did not expressly question the legality of the incentive price for tight formation gas," id. at 446. The view in the Notice was clearly no more than "a tentative conclusion," and "the agency's articulation of this belief did not obligate it to alter the incentive price for tight formation gas." Id. Indeed, to the extent that Williams' petition challenges the FERC's decision to leave the tight formation incentive price rule in place through May 12, 1990, it must rebut the presumption "against changes in current policy that are not justified by the rulemaking record." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (emphasis deleted). See Williams I, 872 F.2d at 444.
 
 
 66
 [291 U.S.App.D.C. 389] The statute is silent on the questions of when and under what circumstances a special incentive ceiling price must be rescinded. The FERC interprets § 107 to require the repeal of an incentive ceiling only upon the Commission's making a valid finding that the ceiling is no longer necessary and reasonable. Order No. 519-A, 55 Fed.Reg. at 18,102, 18,105, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,771, 31,777. This construction is certainly reasonable, and we defer to it. The FERC did not find that conditions had so changed until the short fuse that the Decontrol Act placed under all price regulation of new wells convinced the Commission, in issuing Order No. 519, that the tight formation incentive ceiling had reached the end of its useful life. Thus, unless that finding is set aside, the ceiling price did not contravene the statute at least until that order issued.
 
 
 67
 Williams' first challenge would impose upon the FERC a definition of "necessity" that replaces the NCPR with a purely speculative inquiry, viz. "whether tight sands gas production would have been reduced or eliminated" but for the possibility of contracting to sell it at the special incentive price. As the Fifth Circuit found in upholding Order No. 99, however, the NCPR was designed to insure that the higher price was paid only to a producer that would not develop tight formation gas at the lower applicable ceiling. The Commission has now reaffirmed its confidence in the NCPR. Order No. 519, 55 Fed.Reg. at 6368, 6374, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,664-65, 31,675. Williams' preferred method of gauging necessity is hardly so compelling as to make the FERC's chosen method seem unfounded; in fact, the pipeline's argument fails both as to the reduction and the elimination of production from tight formations. A producer that drilled a well only because it hoped to receive a higher price might, in the event, have to take a lower price rather than shut off the well, but that does not mean that the higher price was not necessary to stimulate the drilling in the first place. In issuing Order No. 99 the FERC betrayed no illusion that the special incentive ceiling would be necessary to bring all tight formations into production. The FERC, and the statute, contemplated that some wells would go into production anyway; hence the NCPR. That the agency was correct on that point does not mean that the incentive ceiling was unnecessary to the incremental development that came about in the hope of commanding a higher price.
 
 
 68
 Second, Williams would have this court reevaluate the questions of "reasonableness" and "necessity" with reference not to the efficiency of the NCPR but rather to national energy policy: Was it reasonable or necessary, that is, for the FERC to continue to stimulate the production of high-cost gas in light of the natural gas glut that has persisted since 1983? To address that issue, however, the court would have to question the premise underlying the entire NGPA. The Congress purposefully designed the statute to increase production by, among other things, providing an incentive for the development of more expensive sources of gas. See FPC v. Texaco, Inc., 417 U.S. 380, 400, 94 S.Ct. 2315, 2327, 41 L.Ed.2d 141 (1974) (not the role of courts "to overturn congressional assumptions embedded into the framework of regulation established by [statute]"). Implicitly in § 107, and explicitly in legislative history, see H.R. CONF.REP. NO. 1752, 95th Cong., 2d Sess. 87, U.S.Code Cong. & Admin.News 1978, 9003, the Congress directed the FERC to set an especially high ceiling price for tight formation gas. Thus, the legislature itself decided that it was necessary and proper, in terms of national energy policy, to provide producers of tight formation gas with the possibility of a return on their investment above the industry average. (Indeed, the 1990 extension of the ITC suggests that the Congress continued to believe, after the FERC had issued the orders under review, that stimulating production from tight formations is sufficiently important to national energy policy to be subsidized by taxpayers.) It is not our office to argue energy policy with the legislature, nor a fortiori with the agency it has charged with implementing that policy.
 
 
 69
 [291 U.S.App.D.C. 390] Williams' third and most visceral argument stems from the difference between the § 107 ceiling ($7.13 in May 1990, when the FERC denied rehearing in Order No. 519-A ) and the average interstate wellhead market price for natural gas ($1.98 at the same time). Compare Maximum Lawful Prices and Inflation Adjustments Under the NGPA, 55 Fed.Reg. 18,864, 18,865 (1990) (amending 18 C.F.R. § 271.101(a) Table I) with Department of Energy, Energy Information Admin., Natural Gas Monthly 21 (July 1990). Williams offers several yardsticks by which to evaluate the reasonableness of the incentive ceiling price, apparently in the hope of making the price that it agreed to pay seem so far out of line that this court will compel the Commission to use its rulemaking power to modify Williams' contractual obligations.
 
 
 70
 To evaluate its consonance with congressional intent, the special ceiling price must be judged not with reference to the current commercial practicality of contracts that lock in the maximum price, but in relation to the scheme of the NGPA. See Order No. 519, 55 Fed.Reg. at 6374-75, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,675-76; Order No. 519-A, 55 Fed.Reg. at 18,102-03, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,772; Order No. 99, 45 Fed.Reg. at 56,039, 1977-1981 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,269 (tight formation ceiling price should "create a 'reasonable' incentive in comparison with other NGPA categories"); see Mobil Oil Exploration & Producing Southeast Inc. v. FERC, --- U.S. ----, 111 S.Ct. 615, 624-25, 112 L.Ed.2d 636 (1991) (affirming as reasonable the FERC's raising some ceilings for old gas, under authority of § 104(b)(2), 15 U.S.C. § 3314(b)(2), to above market level). The Congress could easily have limited the FERC's authority, for example, by capping any incentive price at a certain multiple of "the otherwise applicable maximum lawful price," or perhaps at the rate for stripper well gas set in § 108, which is the highest rate set by statute. But the Congress set no cap; although the Commission's authority to deem a § 107 ceiling price reasonable is not boundless, see Williams I, 872 F.2d at 448, neither has the Commission's chosen method resulted in a price level beyond the pale of the NGPA.
 
 
 71
 Indeed, some of the incentive ceiling prices set directly in the NGPA for other types of gas approach the ceiling for tight formation gas, which the FERC intentionally made the highest of all due to its high cost and slow rate of production. In May 1990, when the tight formation ceiling was $7.130, the § 108 ceiling for stripper well gas was $6.106, or 86% of the tight formation figure; and the § 102 ceiling for certain gas from the Outer Continental Shelf was $5.702, or 80% of the § 107 price. Maximum Lawful Prices and Inflation Adjustments Under the NGPA, 55 Fed.Reg. 18,864, 18,865 (1990) (amending 18 C.F.R. § 271.101(a), Table I). It is well to remember, too, that not one pipeline challenged the ceiling price set in Order No. 99. The American Public Gas Association, in comments to the FERC, put the matter more graphically: "pipelines ... fell all over each other to buy as much of this gas as possible."
 
 
 72
 Fourth, Williams makes the related protest that the Commission erred insofar as it assessed the continuing reasonableness of the tight formation ceiling by examining the effect of the ceiling upon the average prices of gas from all sources and from tight formations in particular. That was not an error, though. The source-based prices in the NGPA range from the very low (for example, for certain types of gas dedicated to interstate commerce before 1974), to the very high (as for stripper well gas, new gas, and § 107 high-cost gas). The Congress, in passing the NGPA, expected pipelines to average out their purchases of higher priced gas with purchases of lower priced gas in order to obtain secure supplies at the margin without severely increasing their average cost, and hence their price to consumers. Order No. 519-A, 55 Fed.Reg. at 18,102-03, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,772. See, e.g., H.REP. NO. 496, pt. 4, at 99, 112-18; 124 CONG.REC. 28,884 (1978) (statement of Sen. Hart); Williams, The [291 U.S.App.D.C. 391] Proposed Sea-Change in Natural Gas Regulation, 6 ENERGY L.J. 233, 243-44 & n. 55 (1985) (scheme of NGPA indicates that Congress assumed rolling in would continue); cf. South Dakota Pub. Utils. Comm'n v. FERC, 934 F.2d at 353. Because the pricing system of the NGPA is premised upon the practice of "rolling in" low-priced gas with high-priced gas, it was reasonable for the Commission to examine the average prices paid by pipelines and upon that basis to determine that the tight formation incentive ceiling had not significantly distorted the prices that consumers ultimately paid.
 
 
 73
 Williams contends that an analysis that incorporates the effect of rolling in does not sufficiently protect the public interest, broadly viewed, because any high price may result in consumers' paying more than they should. Williams insists that the FERC must instead evaluate the reasonableness of the tight formation incentive ceiling price completely in isolation, and only as it relates to the current market price. There is no warrant for so narrow an interpretation of the broad language of § 107(b), however. In addition, we note that the Commission issued the Notice precisely because of its concern that § 107 ceilings might be "exacerbating the current gas pricing problems," that is, that the ceilings might be distorting the overall market price of gas and therefore be unreasonably high. Notice, 48 Fed.Reg. at 7470, 1982-1987 F.E.R.C. Stat. & Regs. [Proposed Regs.] at 32,497. By finding that the price to consumers was not significantly affected by the ceiling, the Commission removed the express basis for its former proposal to change the regulatory status quo. See Order No. 519, 55 Fed.Reg. at 6376, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,678. In fact, when the Commission examined the average price for § 107 tight formation gas, it found that the special incentive ceiling does not significantly affect even that small segment of the market. Order No. 519, 55 Fed.Reg. at 6371-72, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,670-71.
 
 
 74
 The FERC recognized as well that, by stimulating the development of a reliable long-term gas supply, the tight formation incentive ceiling could benefit consumers (and would thus remain reasonable) even though some gas eligible for that ceiling might sell at very high prices. Order No. 519-A, 55 Fed.Reg. at 18,102-03, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,772. We, too, have emphasized that the Commission's responsibility to consumers "does not call for automatic pursuit of the lowest possible gas prices in every case" because the Commission is also responsible for helping to ensure that there is "a reliable and continuing supply of gas." Associated Gas Distribs. v. FERC, 810 F.2d 226, 233 (D.C.Cir.1987). The FERC could and did permissibly conclude that the supply added by the special incentive ceiling price benefits consumers sufficiently to justify the maximum price level. Order No. 519-A, 55 Fed.Reg. at 18,103, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,772.
 
 
 75
 Fifth, Williams argues that the FERC was required to reevaluate the special incentive ceiling by comparing it with the current price of alternate fuels, which it had done in Order No. 99 as part of its confirmation that the ceiling was then reasonable. This argument too lacks merit. In assessing the reasonableness of the ceiling price set in Order No. 99, the FERC also examined relative production costs and the relation of the tight formation ceiling price to other NGPA price ceilings, factors that have not changed. See Order No. 99, 45 Fed.Reg. at 56,038-39, 1977-1981 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,268-69. Furthermore, we have approved above the FERC's unwillingness as a continuing practice to limit the tight formation ceiling to the price of an alternate fuel, most obviously for the reason that if the tight formation ceiling were to fall into the pack of NGPA ceilings, then the regulatory effort to stimulate the production of tight formation gas would be thwarted.
 
 
 76
 The FERC ensured that the incremental incentive furnished by the tight formation ceiling would remain about constant, relative [291 U.S.App.D.C. 392] to other NGPA ceilings, by using the then-current price of alternate fuels only as a reference point by which to set the initial ceiling price for tight formation gas, and providing for the ceiling price to escalate thereafter with inflation. See Order No. 99, 45 Fed.Reg. 56,034, 1977-1981 F.E.R.C. Stat. & Regs. [Regs. Preambles] p 30,183. This is precisely the method that the Congress used, with various adjustments, to set the other price ceilings in the NGPA. Compare H.R. CONF.REP. NO. 1752, 95th Cong., 2d Sess. 72-81 (1978), reprinted in 1978 U.S. CODE CONG. & ADMIN.NEWS 8989-97 (1978) (baseline price ceiling for new natural gas was compromise between versions based upon differing measures of alternate fuel prices; inflation escalator replaced adjustment of prices to track alternate fuel costs) with Order No. 519, 55 Fed.Reg. at 6374, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,675. We can hardly find fault with the agency because its regulation was excessively loyal to the blueprint of the authorizing statute.
 
 
 77
 We note, moreover, that the 101st Congress revisited the NGPA while this case was before the FERC on remand. Congressional displeasure with the FERC's continuing discretion under §§ 107(b) and 107(c)(5) could easily have surfaced then. Instead, the Congress chose only to provide for the FERC's incentive pricing authority under § 107 to expire on the same schedule as the price ceilings directly mandated by the statute. Indeed, the Senate squarely rejected a proposed amendment to the Decontrol Act (the only such proposal in any bill or debate in either House) that would have required the FERC to rescind all remaining § 107 special incentive price ceilings within ninety days. See 135 CONG.REC. S6523-25 (daily ed. June 13, 1989) (87 to 11 vote to table amendment).
 
 
 78
 To be sure, the legislative intent behind the NGPA cannot be divined from the proceedings of a later Congress. See, e.g., Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 117-18, 100 S.Ct. 2051, 2060-61, 64 L.Ed.2d 766 (1980). That the same Congress that provided for the ultimate repeal of § 107 allowed the FERC to retain its authority under that section until it lapses along with Part A does lend support, however, to the view that the FERC's exercise of its authority under § 107 was not unreasonable as of July 1989. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 137, 106 S.Ct. 455, 464, 88 L.Ed.2d 419 (1985) ("refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the administrative construction has been brought to Congress' attention through legislation specifically designed to supplant it"); United States v. Rutherford, 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979) (if, after agency's statutory construction has been brought to its attention, the Congress "has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned"). As with the passport regulation found to have received implicit approval in Haig v. Agee, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), here the Congress in 1989, "though it once again enacted legislation relating to [NGPA price ceilings], left completely untouched the broad rule-making authority granted in the earlier Act." Id. at 301, 101 S.Ct. at 2779 (quoting Zemel v. Rusk, 381 U.S. 1, 12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965)). We thus conclude that the FERC permissibly determined that the tight formation incentive ceiling price scheme was reasonable so long as the NGPA was the Congress's last word upon the matter--that is, until July 1989.
 
 
 79
 b. From the Decontrol Act to Order No. 519
 
 
 80
 Williams' argument that the Commission should have rescinded the ceiling as of a date earlier than May 1990 requires us also to consider the possibility that rescission was indicated as of the date that the Congress passed the Decontrol Act. Order No. 519 was issued less than seven months after enactment of the Decontrol Act, the event that, in the agency's view, tipped the balance against further retention [291 U.S.App.D.C. 393] of the incentive ceiling price. Plainly, therefore, the new rule was not unreasonably delayed after the Act was passed, and Williams does not argue that it was. Cf., e.g., Sierra Club v. Thomas, 828 F.2d 783, 797-98 (D.C.Cir.1987). Nor does Williams contend that the agency, wishing to allow time to dispose of any petitions for rehearing, was unreasonable in delaying the effective date of the rule by three months, until May 12, 1990. Williams does, however, maintain that the incentive ceiling should have been lifted retroactively, that is, with respect to gas that was flowing before the effective date of the FERC's order. To that argument we now turn.
 
 
 81
 2. Retroactivity: Rescission Limited To Newly-Spudded or Recompleted Wells
 
 
 82
 Williams argues that the Commission erred by leaving the higher ceiling in place for gas that had been delivered or was flowing as of May 12, 1990, the effective date of Order No. 519. This argument draws into question both the FERC's decision not to make the rescission of the special incentive effective at an earlier date, and its decision not to apply the new rule to gas already flowing on the effective date it did choose.
 
 
 83
 First. As Williams' counsel acknowledged at oral argument, it is not possible to pinpoint the day upon which a § 107 incentive ceases to be "reasonable" or "necessary." Nonetheless, the Congress delegated to the FERC the necessarily imprecise chore of specifying a date. The FERC did not conclude that immediately upon its enactment the Decontrol Act made the incentive price unreasonable as applied to all gas. Rather, at the time it issued Order No. 519 the Commission determined that, because of the expense and risk involved in developing tight formation gas, "the relatively high ceiling price ... had remained in the public interest, although it could no longer be justified for new supplies to be developed in the future." Order No. 519-A, 55 Fed.Reg. at 18,102-03, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,772.
 
 
 84
 As we held above in rejecting ARCO's petition, the Commission reasonably rescinded the special ceiling price for gas not yet produced. In deciding not to apply its new rule to flowing gas or gas already delivered when the new rule was announced, the agency properly took account of the "adverse effect to others flowing from retroactive application," Transwestern Pipeline Co. v. FERC, 626 F.2d 1266, 1271 (5th Cir.1980); see Heckler v. Community Health Servs., Inc., 467 U.S. 51, 60 n. 12, 104 S.Ct. 2218, 2224 n. 12, 81 L.Ed.2d 42 (1984). The Commission explained that producers "made substantial long-term financial commitments" to develop tight formation gas in the expectation that they would receive the price (above the otherwise applicable ceiling) for which they had contracted. Order No. 519, 55 Fed.Reg. at 6373, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,673-74. Other producers had depended upon the special incentive ceiling in taking the ITC in tax years now passed, and had drilled tight formation wells in reliance upon the availability of that tax credit. Id., 55 Fed.Reg. at 6373, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,674. The agency's policy decision to let the past, contracted-for distribution of funds and tax consequences remain undisturbed is reasonable, finds support in the record, and will not be disturbed here; Williams and other purchasers "ha[ve] no vested right to retroactivity." Transwestern Pipeline, 626 F.2d at 1271. See also Pierce, 9 ENERGY L.J. at 36-37 (allowing "interstate pipelines with large contractual obligations to purchase gas at above-market prices" to bear the costs of transition to competitive gas sales market would be "theoretically correct market-based allocation of transition costs") (citing Kaplow, An Economic Analysis of Legal Transitions, 99 HARV.L.REV. 509 (1986)).
 
 
 85
 The FERC additionally expressed "serious doubts" that it has the power to engage in retroactive rulemaking. Order No. 519-A, 55 Fed.Reg. at 18,102, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,772. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 109 S.Ct. 468, [291 U.S.App.D.C. 394] 102 L.Ed.2d 493 (1988); Beverly Hosp. v. Bowen, 872 F.2d 483 (D.C.Cir.1989). Because the Commission's choice of prospective rulemaking can stand upon another ground, we need not resolve those doubts today.
 
 
 86
 Second. In a variant of its claim that the FERC was required to rescind the incentive ceiling retroactively, Williams claims that § 107 does not permit the Commission to find that the special incentive ceiling price is no longer necessary and reasonable only as applied to wells not yet drilled. Instead, the pipeline insists that the statute requires the FERC also to lower the ceiling with respect to wells that were developed in the expectation of collecting a price up to the higher ceiling when that ceiling was lawful. We can divine no such precise limitation in the terms of § 107.
 
 
 87
 The Commission based its decision not to lower the ceiling for flowing gas upon two grounds. First, it believed that if the incentive ceiling price was reasonable and necessary at the time a producer relied upon it in spudding or recompleting a well, then that price remains reasonable and necessary so long as that well is producing. In other words, an installment contract made at prevailing market rates does not become unreasonable just because market conditions later change. This accords with our previous observation that the reasonableness of an incentive price must be judged as of the time "when the parties actually sat down at the bargaining table and negotiated the gas purchase contracts." See Midwest Gas, 833 F.2d at 355. Retroactive application of the new rule would therefore have deprived producers of an ex ante reasonable price for their high-cost gas. This presumably would leave most if not all of them to earn a lower than normal return on the investment they made in reliance upon the old rule. We will not penalize the FERC's common sense decision not to play fast and loose with the reliance it had induced. See H.R.CONF.REP. NO. 1752, 95th Cong., 2d Sess. 88 (1978) (§ 107 incentive designed to influence producer behavior "in advance of drilling activity"), reprinted in 1978 U.S. CODE CONG. & ADMIN.NEWS at 9004.*
 
 
 88
 The Commission found added support in the solicitude that the Congress had shown in the Decontrol Act for producer reliance upon the system of incentive ceiling prices. Order No. 519, 55 Fed.Reg. at 6374 & n. 65, 1986-1990 F.E.R.C. Stat. & Regs. [Regs. Preambles] at 31,674 & n. 65. The Congress in 1989 was well aware that the market and the NGPA had gone in different directions, and indeed that many of the remaining ceilings had the effect of raising rather than constraining prices. Yet the Congress determined to deregulate with the least disruption to existing contracts, as evidenced by the phased-in decontrol of new wells and the forty-month postponement of complete deregulation. See Pub.L. No. 101-60, § 2; H.R. CONF.REP. NO. 100, 101st Cong., 1st Sess. 3-4 (1989); H.R. REP. NO. 29, 101st Cong., 1st Sess. 4-5 (1989), U.S.Code Cong. & Admin.News 1989, 51.
 
 
 89
 Second, the FERC found that maintaining the "regulatory bargain" was institutionally prudent from its own point of view; otherwise, the regulator's future attempts to provide incentives for desired behavior would be met with skepticism rather than enthusiastic cooperation. As we observed in an earlier case, "An agency which must consider incentives ... may reasonably seek to avoid an unanticipated burden on those members of the industry that had participated in a Commission-sponsored program." APGA, 567 F.2d at 1056.**
 
 
 90
 [291 U.S.App.D.C. 395] In sum, we hold that the FERC, in timing the termination of the tight formation incentive ceiling price, acted permissibly within the broad discretion that § 107 affords it. The Commission reasonably interpreted the governing statute, and adequately performed the duties that fall to it under that interpretation.
 
 III. CONCLUSION
 
 91
 The § 107(c)(5) tight formation incentive ceiling price was reasonable when it was crafted in order to stimulate new gas exploration and development. The Congress has found no occasion to withdraw either the remaining statutory ceilings or the authority under which the FERC created the tight formation ceiling. The legislature having imposed no non-discretionary duty to withdraw the incentive price, neither may we.
 
 
 92
 At bottom, the problems that ARCO and Williams face are attributable not to the FERC but to the Congress. In addition, the long-term contracts into which Williams entered turned out to be unprofitable, but that is no occasion either for judicial relief. [291 U.S.App.D.C. 396] Cf. Pierce, 9 ENERGY L.J. at 15 (pipelines "discount[ed] the risk that contracts negotiated today might be a source of significant marketability problems in the future," because under the more pervasively regulated regime of the Natural Gas Act they "could turn to regulators or Congress with the expectation that they would be relieved of the burdens of their contractual commitments"). Williams gambled and it lost.
 
 
 93
 Because neither ARCO, in its plea for one more year at the trough, nor Williams, with its barely-disguised effort to get relief from its contracts, has demonstrated that the Commission abused its discretion or inadequately explained its action in the rulemaking under review, both petitions for review are
 
 
 94
 Denied.
 
 HARRY T. EDWARDS, Circuit Judge, dissenting:
 
 95
 Section 107(b) of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 et seq. (1988) ("NGPA"), authorizes the Federal Energy Regulatory Commission ("FERC") to set ceiling prices for high-cost natural gas in excess of the otherwise applicable maximum price "to the extent that such special price is necessary to provide reasonable incentives" for high-cost gas production. 15 U.S.C. § 3317(b) (1988). In Williams Natural Gas Co. v. FERC, 872 F.2d 438 (D.C.Cir.1989) ("Williams I "), we recognized that, in order to meet these statutory criteria, an incentive price must both be "necessary to induce production (as evidenced by the ... [gas producer's and purchaser's] contractual agreement [to employ the incentive price] and ... provide a reasonable incentive (as measured by prices for alternative fuels)." Id. at 448 (emphasis in original). We further noted that, in its 1983 Notice of Proposed Rulemaking,[1] FERC had expressed the "tentative conclusion that the incentive price established by Order No. 00[2] was no longer reasonable in comparison to the costs of alternative fuels," a conclusion this court viewed as "tantamount to saying that the tight formation price was no longer authorized by the statute." Id. at 447. Accordingly, we directed FERC to reconsider its decision to retain its incentive price for tight formation gas notwithstanding its own considerable doubts as to the continued propriety of that price.
 
 
 96
 On the record now before us, I do not believe that FERC's orders in response to this court's remand in Williams I[3] afford a reasoned explanation for the agency's ultimate decision not to reduce the incentive price for all tight formation wells spudded, recompleted or reworked after the NOPR's publication in the Federal Register on February 22, 1983 ("post-NOPR wells"). Accordingly, I dissent from the majority's decision to the extent that it affirms (i) FERC's retention of its incentive price on a prospective basis for all post-NOPR wells spudded, recompleted or reworked on or before May 12, 1990, and (ii) the agency's denial of refunds to pipelines for the above-market-rate payments they have already made for tight formation gas from post-NOPR wells.
 
 I.
 
 97
 In enacting the NGPA, Congress never intended that the regulated ceiling prices of gas would exceed market-clearing rates; as the Supreme Court has observed, the NGPA was intended to create price ceilings, not price supports, for gas producers. See FERC v. Martin Exploration Management Co., 486 U.S. 204, 210, 108 S.Ct. 1765, 1769, 100 L.Ed.2d 238 (1988) ("Not one participant in the legislative process suggested that producers should receive higher prices than deregulation would afford [291 U.S.App.D.C. 397] them."); Williams I, 872 F.2d at 440-41 ("the Congress which passed the [NGPA] ... quite plainly supposed that the statutory ceiling prices would be lower than those which would obtain in an unregulated market").
 
 
 98
 Nor did FERC envision above-market incentive ceilings when, in Order No. 99, it authorized producers to charge 200% of the otherwise applicable statutory ceiling rate for tight formation gas. Issued "against a backdrop of rising oil prices ... and relatively little experience with the effects of the NGPA on gas supplies and pricing,"[4] Order No. 99 was the agency's attempt to free high-cost gas from some, but not all, of the price restraints of regulation, in response to commenters' claims that the regulated price for tight formation gas needed to be "at least ... comparable to the free market value of the gas" in order to encourage high-cost gas production.[5]
 
 
 99
 FERC recognized in Order No. 99, however, that "consumers should not be required to pay a price higher than the otherwise applicable NGPA price unless there is a reasonable basis for assuming that a higher price is necessary," and emphasized that its incentive price "must not create perverse incentives."[6] Because Congress had intended the NGPA to provide "a pricing scheme that related incentive prices to the price of competing fuels,"[7] FERC looked to the cost of fuel oil in establishing the upper range for its tight formation incentive price.
 
 
 100
 When the bottom unexpectedly dropped out of the oil market two years later, FERC realized the need to reexamine its incentive price. Although the demand for natural gas had plummeted along with oil prices, prices for gas had only reluctantly responded to this decreased demand, due, FERC noted in its NOPR, "both to the pricing mechanisms built into the NGPA and the contracting practices of pipelines and producers."[8] FERC recognized that, as the agency setting the ceiling price for tight formation gas, it bore some responsibility for the NGPA's pricing mechanisms, and it therefore set out to consider "whether its own decisions in setting incentive ceilings under NGPA section 107(c)(5) ... [were] exacerbating the current gas pricing problems."[9] Tentatively concluding that a ceiling price for tight formation gas in excess of the commodity value of such gas was "contrary to the public interest," FERC proposed to cap the tight formation incentive price at an imputed commodity value as measured by the price of competing fuels.[10]
 
 
 101
 The NOPR was therefore a reasonable proposal intended to remedy a situation that neither Congress nor FERC had ever contemplated--FERC-sanctioned incentive prices for high-cost gas significantly in excess of the prices that such gas could command in an unregulated market.
 
 II.
 
 102
 The principal concern of the NOPR was that above-market incentive prices were "exacerbating ... pricing problems" in the gas industry. Although FERC now purports to repudiate the NOPR's tentative conclusions, its most recent orders contain nothing to suggest that this basic concern was ill-founded.
 
 
 103
 FERC does not deny that its incentive price for tight formation gas has remained substantially higher than the market-clearing rate since 1983. Nor does FERC make [291 U.S.App.D.C. 398] any effort to explain how an above-market ceiling price could provide "reasonable incentives" for the production of high-cost gas in a period during which the demand for such gas has been in sharp decline.
 
 
 104
 Instead, FERC essentially sidesteps the question of the reasonableness of its above-market incentive prices by downplaying the harm that such prices have caused. Thus, FERC claims that pricing problems experienced in the gas industry in the early 1980s, rather than being attributable to the tight formation ceiling price, were an "inevitable part" of the NGPA's transition from a regulated to a largely deregulated pricing environment.[11] This observation, however, is simply beside the point. The NOPR did not suggest that all, or even most, natural gas pricing problems were caused by the tight formation incentive price; indeed, given that high-cost gas represents but a small fraction of the total supply of natural gas, such a claim would be patently absurd. FERC merely reasoned that its tight formation incentive price may have been exacerbating those pricing problems that already existed. This was no doubt true, given that the presence of an incentive price 200% above the otherwise applicable price ceiling maintained strong incentives for the production of high-cost gas when many of the reasons for those incentives had ceased to exist. In short, the fact that many pricing problems under the NGPA may have been "inevitable" hardly justifies the FERC's refusal to remedy those problems within its regulatory control.
 
 
 105
 FERC further implies that any effects of above-market incentive prices on pipelines and consumers were de minimis. As an initial matter, it is doubtful whether FERC could justify retention of otherwise unlawful prices on this basis alone, bearing in mind our admonition in Williams I that an agency's refusal to rectify a statutory violation on the grounds that its import is de minimis "must surely be narrowly circumscribed." 872 F.2d at 447.
 
 
 106
 Even on its own terms, however, FERC's suggestion of de minimis effects is utterly unconvincing. FERC notes that, despite the above-market ceiling rate, the prices actually obtained for tight formation gas had declined by 1988 to near-market levels "due to price-adjustment provisions, market-outs, and renegotiation."[12] In Williams I, however, we found that the ability of pipelines and producers to adjust and renegotiate their contracts did not justify FERC's retention of an unjustified incentive price. We noted that
 
 
 107
 when producers and pipelines renegotiate contracts for tight formation gas, the fact that these contracts reference the current high incentive price will give producers additional leverage, allowing them to extract concessions that would otherwise be unavailable. To put it another way: ... [the availability of renegotiation] may enable pipelines to buy their way out of uneconomical contracts, but the existence of the high incentive price will force them to pay more for the privilege.
 
 
 108
 872 F.2d at 449-50 (emphasis in original). Indeed, FERC's contention that renegotiation and other market mechanisms have mooted the incentive price problem is rather startling given FERC's frank admission elsewhere in Order No. 519 that its tight formation incentive price has "served (and will continue to serve) as a basis for settlements between high-cost gas producers and purchasers seeking to adjust their contractual arrangements to changing market conditions."[13] Thus, like the panel in Williams I, I would reject FERC's suggestion that the problem of an unreasonable ceiling price is "no longer of any consequence simply because the pipelines, by renegotiating their long-term contracts, may [have] be[en] able to avoid some of the costs which the incentive price would otherwise [have] impose[d]." 872 F.2d at 450 (emphasis in original).
 
 
 109
 Moreover, the fact that, by 1988, many of the negative effects of FERC's above-market [291 U.S.App.D.C. 399] ceiling prices may have been ameliorated by industry adjustments to changed market conditions is irrelevant to the separate question of whether FERC itself had a duty to award pipelines retroactive relief for above-market payments they had been making since 1983. Because of the gas industry's long-term "take-or-pay" contracts, pipelines and producers were able to rectify the anomaly of above-market incentives only over the course of several years; the NOPR proposal, on the other hand, would have eliminated the problem virtually at its inception. As we noted in Williams I, "pipelines were surely entitled to assume that the Commission would continue to monitor the ceiling price to ensure that it remained reasonable in light of subsequent developments." Id. at 448. Instead, by its own admission, FERC abdicated this duty after issuing the NOPR and relied upon the gas industry, in time, to take care of the problem itself. We pointed out in Williams I, however, that such deference to the private sector is fundamentally inconsistent with the NGPA, which "can hardly be seen as reflecting unequivocal enthusiasm for market forces as price-setting mechanisms." Id.
 
 
 110
 Perhaps the clearest refutation of FERC's implication that the adverse effects of above-market incentive prices are de minimis is FERC's own reference to substantial producer reliance interests as a justification for not applying its incentive price repeal to all post-NOPR wells. FERC notes that retroactive application of its price repeal to such wells would require gas producers to refund some of the profits they have earned from tight formation gas since 1983, while repealing the price prospectively for such wells would limit these producers' future profits. But the agency simply cannot have it both ways. If the incentive price has created substantial reliance interests for sellers of gas in the form of sizable above-market-level profits (both past and future), then FERC cannot reasonably contend that the effects of that price on buyers of gas have been de minimis.
 
 
 111
 As we noted in Williams I, while pipelines may properly be held to the consequences of their own bad bargains, "it is quite another matter if the contracts are unfavorable because they incorporate an incentive price which is no longer consonant with the statute." Id. at 450. After itself calling its incentive price into serious question, FERC has failed to make any showing that the retention of the incentive price after 1983 was "reasonable" as required by the NGPA. Accordingly, I discern no legitimate basis for FERC's disavowal of its conclusion in the 1983 NOPR that the ceiling for tight formation gas prices had ceased to be in the public interest as of that time.
 
 III.
 
 112
 Because I believe that FERC has never effectively rebutted its tentative conclusion in the NOPR that its above-market incentive price was no longer "reasonable" as of 1983, I next consider whether the agency had some other justification for not repealing its incentive price as of the publication date of the NOPR. In Order No. 519, FERC stated that application of its price repeal either retroactively or prospectively to post-NOPR wells would have unfairly frustrated the reliance interests of producers. FERC indicated that it did not "wish to take any action to undo existing settlements [based upon the former ceiling rate], to jeopardize future settlements, or to frustrate federal tax incentives adopted by Congress" and claimed that "[i]t would not be fair or in the public interest to expect producers to halt on-going gas development projects on the basis of only a proposal" because producers reasonably could "have concluded that the specific application dates of the proposed rule might never become law."[14]
 
 
 113
 On the record at hand, there is no reasonable way to justify FERC's action on the basis of producer reliance interests. As FERC itself admits, an "incentive ceiling price should be removed at whatever point [291 U.S.App.D.C. 400] in time it ceases to be justified."[15] FERC has never persuasively shown that its above-market incentive price was reasonable after 1983, which, as we noted inWilliams I, is tantamount to a concession that the incentive price was unlawful from that time onward. While justifiable reliance interests are an appropriate consideration when weighing the proper scope of agency action, parties "cannot claim justifiable reliance or protectable expectations based on ... [agency] action which was illegal." Tennessee Valley Mun. Gas Ass'n v. FPC, 470 F.2d 446, 453 (D.C.Cir.1972). Absent any showing that the incentive price met the criteria of NGPA section 107(b) after 1983, the agency's decision nonetheless to retain that price must be viewed as violative of the governing statute. Producers should have recognized that the incentive price was at all times subject to the Act's "reasonableness" requirement, and that FERC was statutorily obligated "to monitor the ceiling price to ensure that it remained reasonable in light of subsequent developments." Williams I, 872 F.2d at 448.
 
 
 114
 Any doubts producers may have had on this score should have evaporated upon publication of the NOPR, which expressly questioned the continued legitimacy of the ceiling price and proposed to reduce the incentive price to market levels for all new tight formation wells. Producers who invested in tight formation gas after the issuance of the NOPR thus took a calculated risk--although the NOPR contained only FERC's tentative conclusions, it expressly notified such producers that any rule ultimately adopted by FERC might rectify, as of February 22, 1983, the incongruity of above-market incentive prices. Any producers who forged ahead with tight formation investments on the chance that FERC would retain an incentive price that bore no rational relationship to market realities simply cannot lay claim to "reasonable" reliance interests.
 
 
 115
 The tenuous status of FERC's incentive price was trumpeted even more loudly by our decision in Williams I, which delineated in some detail the dubious legality of above-market NGPA price ceilings. Yet, FERC has left its above-market incentive price intact even for those producers who developed tight formation wells after the issuance of Williams I. The practical effect of the agency's decision is to allow private parties, despite receiving unequivocal notice that an existing rule may be unlawful, to exploit the rule with complete impunity simply by relying upon it before the agency has had an opportunity to take final corrective action. Such a definition of "reasonable reliance" interests, in my view, cannot help but create perverse and mischievous incentives for private party conduct.[16]
 
 
 116
 In Williams I, we held that FERC is obligated to adjust the incentive price periodically to reflect changes in the gas market. Apparently due solely to its own regulatory inertia following the issuance of the NOPR, the agency failed to carry out that obligation in this case. As I do not believe that FERC has ever provided an adequate explanation for its decision to accord neither retroactive nor prospective relief to pipelines and consumers charged above-market incentive prices for gas from [291 U.S.App.D.C. 401] post-NOPR wells, I would grant the petition for review and remand the case to FERC.
 
 
 117
 The dissent's criticism of the FERC's concern for producer reliance interests with respect to wells drilled after the issuance of the Notice, diss. op. at 7, is puzzling given that Williams, the only party now protesting the continuation of the special incentive price, told the FERC in 1989 that the special ceiling was of regulatory interest only as applied to older wells and contracts. "[F]ew high cost wells have been drilled since 1983," and for many of those "the price would likely not be a problem" because "contracts executed after February 1983 generally contained effective market-out provisions or some other means of obtaining market-based pricing." Motion of Williams Natural Gas Co. for Expedited Action on Remand 15-17.
 
 
 
 **
 Finally, Williams claims, and the dissent agrees, diss. op. at 1343 n. 16, that the FERC arbitrarily failed to consider two alternative schemes that the company proffered, but this simply is not so. The Commission plainly considered and rejected Williams' proposal to apply the rule change to flowing gas. Order No. 519, 55 Fed.Reg. at 6373 n. 62, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,674 n. 62. Williams also proposed that the incentive ceiling be rescinded retroactively to the date that any particular well "achieved payout or return of investment," or "where wells were funded by pipelines or their customers, to February 22, 1983." Request of Williams Natural Gas for Rehearing 25-26. The Commission had already rejected application of the new rule to gas already delivered, e.g., id., 55 Fed.Reg. at 6373-74, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,673-74; that rejection, repeated upon rehearing, plainly encompassed Williams' proposals. Moreover, the Commission pointed out on rehearing that the pipeline's proposals depended upon the premise, tentatively surfaced in the Notice but conclusively rejected in Order No. 519, that the tight formation incentive price was illegal as of 1983. Order No. 519-A, 55 Fed.Reg. at 18,102, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,771-72
 Williams' proposal for a special rule to apply "where wells were funded by pipelines or their customers, to February 22, 1983" is particularly disingenuous, for there is no sign that such a situation exists apart from two arrangements engineered by Williams' predecessor. Williams has been quite willing to pay the tight formation incentive ceiling price to its own affiliated producers. See Midwest Gas Users Ass'n v. FERC, 833 F.2d 341, 345 n. 3, 346 (D.C.Cir.1987); see also CSG Exploration Co. v. FERC, 930 F.2d 1477 (10th Cir.1991). The situation behind Williams' loudest complaints--the contracts pursuant to which the pipeline's predecessor "expended about $350 million in funding the development of a large number of tight sands wells in Wyoming," Williams Brief at 40--hardly unbalances the equities in favor of the pipeline. There, the producer was a limited partnership of which Williams' predecessor, through a subsidiary, was a limited partner. Williams "had more than adequate gas reserves to meet current and future demands" when it reformed the contracts to meet the negotiated contract price requirement for the tight formation incentive price. Midwest Gas, 833 F.2d at 354 n. 16 (four-year surplus). Because Williams' share of the proceeds was front-loaded by contract--it received 80% of the net proceeds until it was reimbursed but only 5% to 25% of the net proceeds thereafter, see id. at 346--it now complains, in essence, that its former partners are receiving their share of the deal. The argument that drilling costs may be recouped early in the life cycle of a tight formation well only restates the known production curve of such wells--very high in the first year or two, and low but steady for many years thereafter, see Order No. 99, 45 Fed.Reg. at 56,035, 56,039, 1977-1981 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,268.
 The Commission pointed out that nothing in Williams' or any other party's comments demonstrated that the agency's approach was inappropriate for the run of cases. Order No. 519-A, 55 Fed.Reg. at 18,103, 1986-1990 F.E.R.C. Stats. & Regs. [Regs. Preambles] at 31,772-73. Williams' proposal amounts to a request that the FERC require "case-by-case economic justification" for the § 107 price ceiling, Midwest Gas, 833 F.2d at 351, which this court has already recognized is unnecessary. Id.; cf. Wisconsin Gas Co. v. FERC, 770 F.2d 1144, 1166 (D.C.Cir.1985) (rejecting challenge to use of rulemaking rather than tailoring regulatory scheme to individual circumstances of petitioners). Indeed, there is nothing in the statute that would permit, much less require, the FERC to institute a scheme of well-by-well price ceilings.
 If Williams' contracts present an exception to the general state of affairs for which the rule is justified, then the company's proper recourse is to the adjustment process set out in § 503 of the NGPA. Neither Williams nor any individual producer is entitled to "an industry-wide solution for a problem that exists only in isolated pockets." Associated Gas Distribs. v. FERC, 824 F.2d 981, 1019 (D.C.Cir.1987). Williams may have been improvident--or even just unlucky--in contracting for § 107(c)(5) gas rather than another variety of price-controlled gas, but that is of no moment to the validity of a rule that must apply to all comers.
 
 
 [1]
 Limitation on Incentive Prices for High-Cost Gas to Commodity Values, 48 Fed.Reg. 7469 (1983) [hereinafter NOPR]
 
 
 [2]
 Regulations Covering High-Cost Natural Gas Produced from Tight Formations, 45 Fed.Reg. 56,034 (1980) [hereinafter Order No. 99]
 
 
 [3]
 Limitation on Incentive Prices for High-Cost Gas to Commodity Values, 55 Fed.Reg. 6367 (1990) [hereinafter, Order No. 519]; Limitation on Incentive Prices for High-Cost Gas to Commodity Values; Order Denying Rehearing, 55 Fed.Reg. 18,100 (1990) [hereinafter, Order No. 519-A]
 
 
 [4]
 NOPR, supra note 1, at 7470
 
 
 [5]
 Order No. 99, supra note 2, at 56,037
 
 
 [6]
 Id. (emphasis added)
 
 
 [7]
 Id. at 56,038
 
 
 [8]
 NOPR, supra note 1, at 7470. As we noted in Williams I, gas contracts between producers and pipelines "typically span very long periods of time, and the price is often contractually tied to the price ceiling established by the statute or regulations." 872 F.2d at 441. Gas prices were thus relatively unresponsive in the short term to the extreme fluctuations in the worldwide energy market in the early 1980s, as "take-or-pay" contracts obligated many pipelines to pay the prevailing regulatory ceiling price, which, despite the changed market, remained the 200% incentive price established in Order No. 99
 
 
 [9]
 NOPR, supra note 1, at 7470
 
 
 [10]
 Id
 
 
 [11]
 Order No. 519, supra note 3, at 6375
 
 
 [12]
 Order No. 519, supra note 3, at 6375
 
 
 [13]
 Order No. 519, supra note 3, at 6373 (emphasis added)
 
 
 [14]
 Order No. 519, supra note 3, at 6373-74
 
 
 [15]
 Order No. 519-A, supra note 3, at 18,105
 
 
 [16]
 Even were I to credit the reliance interests cited by FERC, I would view its blanket refusal to broaden the effect of its price repeal as arbitrary and capricious. Petitioner Williams Natural Gas Company ("Williams") had suggested less drastic means of protecting reliance interests, proposing, e.g., that the incentive price could be eliminated for future gas produced from wells funded by a pipeline or its customers, rather than by a producer, since no producer reliance interests would be implicated in such price reductions. For those wells which had been funded by producers, Williams suggested that retention of the incentive price should be permitted only until the costs of the well had been recovered. FERC did not specifically address these alternatives, merely stating in conclusory fashion that producers "generally" had legitimate reliance interests and that it would be "difficult and fruitless ... to determine on a case-by-case basis the adverse financial impact on a specific producer of changing the incentive ceiling price for all flowing gas." Order No. 519, supra note 3, at 6374 n. 62. Given the apparent illegality of the incentive ceiling price at issue, this is hardly a satisfactory response